This Court issued a writ of certiorari in this case to address the questions raised by an advisory opinion request from the Governor. See Opinion of the Justices No.330, 558 So.2d 390 (Ala. 1989). At issue is the constitutionality of Alabama's franchise tax on corporations that are incorporated under the laws of other states, Ala. Code 1975, § 40-14-41 (foreign corporations). The challenge to § 40-14-41 concerns the relation of the tax imposed by that section to the franchise tax on corporations *Page 374 
that are incorporated under the laws of this state, Ala. Code 1975, § 40-14-40 (domestic corporations). The two taxes are mandated by Ala. Const. 1901, Art. XII, §§ 229 and 232. The trial court held that § 40-14-41 violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, pretermitting discussion of the plaintiffs' challenge under the Commerce Clause, U.S. Const. Art. I, § 8, cl. 3. The Court of Civil Appeals affirmed,White v. Reynolds Metals Co., 558 So.2d 367
(Ala.Civ.App. 1989).
On July 28, 1986, Reynolds Metals Company filed a petition for a writ of mandamus ordering the Commissioner of Revenue to set aside assessments of franchise taxes paid by Reynolds in 1982 and 1983 and to refund the taxes paid. Similar petitions, or appeals from denials of refunds, were filed by General Motors Acceptance Corporation ("GMAC"), GMAC Leasing Corporation, and General Motors Corporation ("GM"). Because all of the proceedings challenged assessments made pursuant to § 40-14-41 as violating the Equal Protection Clause and the Commerce Clause, the cases were consolidated. Amended pleadings were filed regarding subsequent tax years. The trial court entered a summary judgment for the plaintiffs.
Section 229 of the Constitution, as amended by Amendment 27, reads, in pertinent part:
 "The legislature shall, by general laws, provide for the payment to the state of Alabama of a franchise tax by corporations organized under the laws of this state which shall be in proportion to the amount of capital stock."
(Emphasis added.)
Section 232 of the Constitution, as amended by Amendment 473,[1] reads, in pertinent part:
 "No foreign corporation shall do business in this state without having at least one known place of business and an authorized agent or agents therein, and without filing with the secretary of state a certified copy of its articles of incorporation or association. . . . The legislature shall, by general law, provide for the payment to the state of Alabama of a franchise tax by such corporation, but such franchise tax shall be based on the actual amount of capital employed in this state."
(Emphasis added.)
Section 40-14-40 imposes on domestic corporations an annual franchise tax of $10 on each $1000 of capital stock, or a minimum of $50. Section 40-14-41(a) imposes on foreign corporations an annual franchise tax of $3 on each $1,000 of "the actual amount of its capital employed in this state," or a minimum of $25. Paragraph (b) of § 40-14-41 defines "capital," as we shall more fully discuss below; paragraph (c) provides that the actual amount of capital employed in this state "shall be determined in accordance with generally accepted accounting principles appropriate in the particular case"; and paragraph (d) sets forth exclusions and deductions.[2]
The circuit court and the Court of Civil Appeals viewed the Equal Protection Clause as requiring that the same franchise tax be imposed on both domestic and foreign corporations. However, § 40-14-40 imposes a tax that is "in proportion to the amount of capital stock" of a domestic corporation, that is, exactly as prescribed by § 229 of the Constitution; and, although § 40-14-41 provides in detail for the measurement of the "actual amount of capital employed" by a foreign corporation in this state, that section also sets forth a method of taxation that is designed to follow the mandate of the corresponding section of the constitution, § 232.
A franchise tax that apportioned a domestic corporation's capital stock according to how much of it was employed in this *Page 375 
state, or that used a different measure than "capital stock," would presumably not be "in proportion to the amount of capital stock" and thus would violate § 229. A franchise tax on the full amount of a foreign corporation's capital stock would clearly violate § 232. Thus, it appears that a tax calculated in the same manner for both domestic and foreign corporations would violate either § 229 or § 232 and that the legislature would be justified in enacting franchise taxes tailored to the terms of those sections.
Therefore, a holding that the Equal Protection Clause or the Commerce Clause requires the same tax to be applied to both domestic and foreign corporations appears to require a holding that either § 229 or § 232 of our Constitution violates the United States Constitution. This we are loath to do. Although the Supremacy Clause, U.S. Const. Art. VI, cl. 2, binds "the judges in every state" to abide by the United States Constitution, "any thing in the Constitution or laws of any state to the contrary notwithstanding," we are also sworn to "support the Constitution of the United States, and the Constitution of the State of Alabama." Ala. Const. 1901, Art. XVI, § 279. It is therefore our duty to support both, if that be possible, before we conclude that the one violates the other.
 History of the Franchise Taxes
To clarify the current relationship of the domestic and foreign corporation franchise taxes, we shall summarize their historical development.
After the adoption of the Constitution of 1901, the legislature adopted a franchise tax only on foreign corporations. Ala. Code 1907, §§ 2391-2400. This Court affirmed an assessment of taxes under that act, SouthernRy. v. Greene, 160 Ala. 396, 49 So. 404 (1909), but the Supreme Court of the United States reversed, 216 U.S. 400,30 S.Ct. 287, 54 L.Ed. 536 (1910), holding that the tax violated the Equal Protection Clause.
The legislature responded by enacting a franchise tax on both domestic and foreign corporations, in the manner prescribed by the respective constitutional sections. Acts 1915, Act No. 464. In Louisville N. R.R. v. State, 201 Ala. 317, 318,78 So. 93, 94 (1918),[3] the Court held that the tax did not "operate as an arbitrary discrimination against foreign corporations." The statute levied a tax on every domestic corporation, with exceptions as provided in § 229, of 40 cents per $1,000 "of its paid-up capital stock" and a tax on foreign corporations, with exceptions as provided in § 232, of 40 cents per $1,000 "on the amount of capital actually employed in this state." The Court distinguished the tax from the one invalidated in Southern Ry. v. Greene, supra, and included the following discussion of the history of §§ 229 and 232:
 "The act, both as to foreign and domestic corporations, employs the exact language of the Constitution, and if we look to the journal and debates of the constitutional convention upon the adoption of sections 229 and 232, we think it is well demonstrated that the difference between the two was made for the sole purpose of avoiding a discrimination against foreign corporations. The committee on corporations reported to the convention section 229 as it now appears in our Constitution, and section 232, as reported, contained the words 'in proportion to the amount of its capital stock.' An amendment was offered by Mr. Kyle, changing the words as italicized so as to read, 'shall be based on the actual amount of capital employed in this state.' In support of this amendment Mr. Kyle, among other things, said:
 " 'For instance, take the Tennessee Coal 
Iron Co. They have a capitalization of $30,000,000. They have large property in Tennessee as well as in Alabama. Therefore it should not be required of them, or any other corporation of like character, to pay its franchise tax upon property they own in other states. Take the Southern Iron Foundry Company. They have a capitalization of $600,000 and own a small plant in this state. The main plant is in Tennessee. This amendment would reach all the capital they had in use in Alabama, but they would *Page 376 
not have to pay upon the entire capital stock. The Western Union Telegraph Company, with $80,000,000 capital, would have to pay on the capital of $80,000,000 instead of what she has in this state. So this reaches the matter and makes it the property in possession of the state. The committee will accept that I hope.'
 "The section as amended was then adopted. Of course, this court is not bound by the debates of the constitutional convention, but they are often looked to, and the one in question is very persuasive that the framers of our organic law did not intend to discriminate against foreign corporations as to a franchise tax and adopted the foregoing amendment to section 232 for the sole purpose of avoiding a discrimination by fixing the basis for the franchise tax upon the amount of property actually employed in this state."
The constitutional convention, therefore, expressly amended the corporation committee's proposal that became § 232, so that a foreign corporation's franchise tax would be calculated according to the portion of its capital employed in this state, but it did not make such a change in the same committee's identically worded proposal for the tax on domestic corporations. The convention clearly envisioned that, absent the offered amendment, the proposed tax "in proportion to the amount of capital stock" would be calculated on the entire capitalization of the corporation. No such amendment was offered for the proposal that became § 229, so that section of the constitution directs the legislature to impose the tax on a domestic corporation's "capital stock" and does not provide for a reduction of a domestic corporation's franchise tax in proportion to its out-of-state capital.[4]
It can also be seen from the quoted portion of Louisville N. R.R. that the Court considered the term "paid-up capital stock" to be synonymous to the term "capital stock." The Court later upheld franchise taxes imposed on a domestic corporation "with a paid-up capital stock of $7,400,000," even though the corporation was in receivership. State v.Bradley, 207 Ala. 677, 678, 93 So. 595, 596 (1922).
 "The Constitution of 1901 (section 229, quoted ante) and the laws of Alabama impose 'franchise taxes' upon all existing domestic corporations, aside from exceptions of classes of which this corporation is not a member. Given the existence of a domestic corporation, the rate and tax period being prescribed by law as has been done, the only possible inquiry is the amount of the paid-up capital stock of the corporation. No assessment of the charge or imposition of this 'franchise tax' is required or even possible under the laws, organic and statutory, of this state. Assessment, for purpose of taxation — a quasi judicial act — was defined in Perry County v. R.R. Co., 58 Ala. 552, as consisting of a listing and an appraisal of the value of the items of property listed. Neither of these acts is requisite to the imposition or exaction of a 'franchise tax' on domestic corporations; the laws of the state themselves effecting to impose the charge and exact its payment in expressly stipulated circumstances. The ascertainment, in a concrete case, of the monetary measure of the 'franchise tax' imposed and demandable, upon the basis of the domestic corporation's paid-up capital stock, is not a judicial, but a ministerial, act of the governmental authority charged with the duty of performing that service. Grider v. Tally, 77 Ala. 422, 424-426, 54 Am. Rep. 65. *Page 377 
 "A duty 'is ministerial when the law exacting its discharge prescribes and defines the time, mode, and occasion of its performance with such certainty that nothing remains for judgment or discretion. Official action, the result of performing a certain and specific duty arising from fixed and designated facts, is a ministerial act.' Grider v. Tally, supra.
 "In ascertaining the sum of the paid-up capital stock for the calculation of the amount of the 'franchise tax' demandable of a domestic corporation, no judicial discretion or judgment is left to the body charged with that duty."
Id., 207 Ala. at 679, 93 So. at 596.
Thus, in the course of discussing whether a corporation in receivership was subject to the franchise tax, the Court firmly established the interpretation that the franchise tax would be measured by the corporation's paid-up capital stock, with no other factors taken into consideration. In 1920, the Attorney General issued an opinion stating that surplus capital was not to be included within the term "capital stock" as used in § 229. Atty. Gen.'s Biennial Report for 1919-20, p. 570. We do not see that that interpretation is necessarily a correct interpretation of § 229.
The Court in Ellis v. W.A. Handley Mfg. Co.,214 Ala. 539, 540, 108 So. 343, 344 (1926), a case involving the foreign corporation franchise tax, noted:
 "We are, of course, aware of the fact that in some instances 'capital' and 'capital stock' are used interchangeably, but such cannot be the case here, as section 229 of the Constitution, in dealing with domestic corporations, expressly bases the franchise tax on the 'capital stock,' while section 232 bases the franchise tax on foreign corporations on the 'actual amount of capital employed in this state.' "
See, also, State v. Guaranty Savings Building LoanAss'n, 225 Ala. 481, 144 So. 104 (1932), holding a domestic building and loan association subject to a franchise tax on its paid-in (or paid-up — the two terms are synonymous) capital stock, and holding a statute declaring the contrary unconstitutional under § 229. That decision was overturned by Amendment 27, ratified in 1935, which exempted such institutions and retroactively ratified the statutes declaring such an exemption.
In 1982, the Court of Civil Appeals followed State v.Bradley's holding that a domestic corporation in receivership is subject to the franchise tax.[5] State,Dep't of Revenue v. Forrester, 419 So.2d 231
(Ala.Civ.App. 1982). The Court also reiterated Bradley's statements that the tax on a domestic corporation is based on the amount of its capital stock, not on the value of its property:
 "The franchise tax on domestic corporations is based upon the amount of capital stock of the corporation and not upon the value of the corporate property. Article XII, § 229, Constitution of Alabama (1901); §§ 40-14-40 and -41.1, Code 1975. Alabama's franchise tax upon Alabama corporations 'is imposed upon corporate existence, not corporate activity or exerted corporate function.' Statev. Bradley, 207 Ala. 677, 93 So. 595 (1922). In that case it was determined that the appointment of a receiver did not work a dissolution of the corporation and, although under receivership, the franchise tax was collectible."
Id., 419 So.2d at 233.
Again in 1987, the Court of Civil Appeals cited the principle that § 229 allows imposition of a tax only on the amount of a domestic corporation's capital stock. The court held that "anonstock member association" is not subject to the tax because it has no capital stock on which the tax can be imposed. State v. Raymond M. Sims, D.M.D., P.A.,519 So.2d 523, 523 (Ala.Civ.App. 1987) (emphasis in original),writ quashed, 519 So.2d 524 (Ala. 1987).
Although these recent cases by the Court of Civil Appeals reaffirm the principle that a domestic corporation's franchise tax must *Page 378 
be in proportion to the amount of its capital stock, they do not re-examine, in the light of the changed treatment of corporate stock, the old holdings that "capital stock" includes only paid-in capital stock. We see nothing in § 229 that necessarily limits the term "capital stock" to "paid-in capital stock." Although that interpretation may have been appropriate at one time, there is nothing in § 229 that prevents the legislature, should it so choose, from assigning to "capital stock" a meaning other than paid-in value.
There are many more cases applying the franchise tax on foreign corporations than there are applying the tax on domestic corporations, and they have concerned questions such as whether the property or business sought to be included in the tax base was in fact "capital employed" in this state by the foreign corporation, and, if so, how to measure its value and apportion it to the tax imposed in this state. See, e.g.,Ellis, supra; State v. National Cash Credit Ass'n,224 Ala. 629, 141 So. 541 (1932); State v. Anglo-ChileanNitrate Sales Corp., 225 Ala. 141, 142 So. 87 (1932),reversed, 288 U.S. 218, 53 S.Ct. 373, 77 L.Ed. 710
(1933); Investors' Syndicate v. State, 227 Ala. 216,149 So. 83 (1933); State v. Southern Natural GasCorp., 233 Ala. 81, 170 So. 178 (1936), affirmed,301 U.S. 148, 57 S.Ct. 696, 81 L.Ed. 970 (1937); State v.Pullman-Standard Car Mfg. Co., 235 Ala. 493, 179 So. 541
(1938); Alabama Textile Products Corp. v. State,263 Ala. 533, 83 So.2d 42 (1955).
At least partially in response to the holdings in some of the above cases, the legislature passed numerous amendments to the foreign corporation franchise tax, refining the definition of "capital employed" and providing certain exemptions. See, e.g., Acts 1935, No. 194; Acts 1955, Second Ex. Session, No. 74; Acts 1961, No. 912; Acts 1963, No. 255; Acts 1965, No. 764; Acts 1969, No. 1138; Acts 1971, First Ex. Session, No. 103; Acts 1971, No. 499; Acts 1973, Nos. 469 and 1173; Acts 1985, No. 85-412; Acts 1986, No. 86-214.
In contrast, the only amendments to the domestic franchise tax before 1983 simply raised the millage rate in conjunction with equal increases in the millage rate of the foreign corporation franchise tax. Acts 1935, No. 194; Acts 1955, Second Ex. Session, No. 74; Acts 1971, First Ex. Session, No. 103.
The legislature maintained the same rate on the two taxes until 1983, when it increased the rate for domestic corporations to $10 per $1000 of capital stock, or a minimum of $50. Acts 1983, No. 83-745. On the motions for summary judgment, the parties submitted the depositions of James Sizemore, the Commissioner of the Department of Revenue, and Ernest Broadhead, the Chief of the Department's Division of Franchise Tax. Broadhead explained the genesis of the increase in the domestic tax rate. He explained that in 1983, at the request of some legislators, he drafted a proposed amendment of the domestic franchise tax that would have imposed that tax in the same manner as the tax on foreign corporations. The draft included a bill that would have proposed an amendment to § 229. When it became clear that those bills would not pass, Broadhead said, he hastily drafted a substitute bill, which became Act No. 83-745.
Long before these efforts to amend § 40-14-40, the legislature had passed a tax on the stock of domestic corporations that seems clearly to have been designed to offset the reduced base of the domestic franchise tax. Sections40-14-40 and -41 trace back to the General Revenue Act of 1935, Act No. 194. In that same Act, the legislature imposed a tax on the stock of domestic corporations.[6] That stock tax is now codified at § 40-14-70 et seq. Its approach for valuing the stock is somewhat similar to the provisions in § 40-14-41
for valuing the capital employed in this state by a foreign corporation.
Although the domestic corporate stock tax is nominally imposed on the stockholders, *Page 379 
not the corporation, § 40-14-73 allows a corporation to avoid filing a list of its shareholders by agreeing to pay the tax itself. Commissioner Sizemore stated in his deposition that all domestic corporations pay the tax, and Broadhead stated the same thing in an affidavit. There was evidence presented on the summary judgment motions showing the relationships among the foreign corporation franchise tax, the domestic corporation franchise tax, and the domestic corporation stock tax, as we shall show below.
The following overview of corporate franchise/capital stock taxes was published in 1965 as Chapter 29 of the Report of the Special Subcommittee on State Taxation of Interstate Commerce of the Committee on The Judiciary, House of Representatives, June 30, 1965, Vol. 3, Part IV. It provides an informative background to the detailed history of such taxes in Alabama. The excerpts here are from pp. 903-911:
 "At the present time thirty-six States[1] and the District of Columbia[2] raise revenue from businesses in corporate form through taxes measured in one way or another by the amount of the corporation's capital. Thus, in terms of the number of States employing it, the capital stock tax is comparable to the corporate net income tax and the sales tax.
". . . .
 "At the outset, it should be noted that taxes on or measured by corporate capital are levied under various names, such as 'Corporation Franchise Tax,' 'Corporation License Tax,' or 'Corporation Business Tax.' Although they employ a wide range of techniques for valuing the tax base, all are annually recurring levies measured by the value of a corporation's capital, as distinct from its property. These taxes will be treated together in this report under the term 'capital stock taxes.' They have been selected for study as a group because they raise a common problem for multistate business. Since the tax is computed by reference to the entire value of the corporation's capital, it becomes necessary to determine what proportion of that value is taxable in each State. It is this common problem of division of the base which more than any other makes these taxes suitable for study as a group.
 "Despite the wide variety among capital stock taxes in techniques for valuing the tax base, the bases employed fall readily into two general categories. In one category are narrow bases taken from the corporation's statement of capital, either authorized shares or outstanding (or issued) shares, generally valued at par in the case of par-value shares and at various arbitrary amounts, such as $100 a share, in the case of no-par shares. Tax bases of this type will be classified under the term 'capital-account' bases. In the other category are broader bases reflecting in a variety of ways historical earning capacity or value as a continuing business enterprise. These bases are generally defined in terms of balance sheet items with some adjustments for more realistic valuation. They may be measured by corporate net worth (i.e., the excess of assets over liabilities); or by the market value of the corporation's shares. All of these bases will be classified under the term 'capital-value' bases. Also included with the capital-value bases are the so-called 'corporate excess' taxes, although their closer relation to property taxes requires separate historical treatment in this chapter.
". . . .
 "Beginning about the turn of the century, the number of capital stock tax States grew rapidly. In 1902, there were thirteen such States. By 1912, the number had reached twenty-five, and by 1929 it was thirty-three. The surge of capital stock taxes appears to have crested by 1929; since then the total has increased by only four.
". . . .
 "This brief history demonstrates how the capital stock tax grew out of two very distinct forms of tax, each of which has left traces that are important in any appraisal of the present system. On the one hand, there were the one-time incorporation and entrance fees exacted for *Page 380 
the privilege of existence or operation as a corporation. These fees, even if not flat amounts, are measured with reference only to the technical corporate structure. The capital account taxes today appear to be such fees made annually recurring. This form of tax base is readily ascertainable, but takes no account of the going-concern value of the corporation.
 "On the other hand, there were the ad valorem property taxes. Today's capital value taxes appear to have evolved from these property taxes, and are measured by a base which is essentially the entire corporation valued as an entity. Tax bases of this kind are not calculable according to precise statutory rules, but instead their definition consists of no more than a generalized standard for valuation. Indeed, in many States the tax authorities have power to consider any facts found relevant in reaching a correct valuation and to revise the taxpayer's valuation and make an additional assessment.
". . . .
 "The capital stock tax has retained features which inhibit its revenue-producing potential. The most important of these is the continued use by half of the States of capital-account bases, which fail to reflect any element of going-concern value.
In the terms of that report, one could say that § 40-14-40
imposes on domestic corporations a capital-account tax, and that §§ 40-14-41 and -70 impose capital-value taxes.
Given these facts, we now turn to a discussion of the standards that have been developed by the United States Supreme Court for applying the Equal Protection and Commerce Clauses to questions similar to the ones presented here.
 Equal Protection of the Laws
The Equal Protection Clause provides: "No state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. 14. The term "person" was long ago held to apply to corporations. Santa Clara County v.Southern Pac. R.R., 118 U.S. 394, 6 S.Ct. 1132,30 L.Ed. 118 (1886); and see Metropolitan Life Ins. Co. v.Ward, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985).
State tax legislation is given great deference before it will be found to be in violation of the Equal Protection Clause.
 "The States have a very wide discretion in the laying of their taxes. When dealing with their proper domestic concerns, and not trenching upon the prerogatives of the National Government or violating the guaranties of the Federal Constitution, the States have the attribute of sovereign powers in devising their fiscal systems to ensure revenue and foster their local interest. Of course, the States, in the exercise of their taxing power, are subject to the requirements of the Equal Protection Clause of the Fourteenth Amendment. But that clause imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation. The State may impose different specific taxes upon different trades and professions and may vary the rate of excise upon various products. It is not required to resort to close distinctions or to maintain a precise, scientific uniformity with reference to composition, use or value. . . . . 'To hold otherwise would be to subject the essential taxing power of the State to an intolerable supervision, hostile to the basic principles of our government and wholly beyond the protection which the general clause of the Fourteenth Amendment was intended to assure.' "
Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522,526-27, 79 S. Ct. 437, 440-41, 3 L.Ed.2d 480 (1959), quotingOhio Oil Co. v. *Page 381 Conway, 281 U.S. 146, 159, 50 S.Ct. 310, 313,74 L.Ed. 775 (1930).
 "The Equal Protection Clause does not mean that a State may not draw lines that treat one class of individuals or entities differently from the others. The test is whether the difference in treatment is an invidious discrimination. Harper v. Virginia Board of Elections, 383 U.S. 663, 666, 86 S.Ct. 1079, 1081, 16 L.Ed.2d 169. Where taxation is concerned and no specific federal right, apart from equal protection, is imperiled, the States have large leeway in making classifications and drawing lines which in their judgment produce reasonable systems of taxation."
Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356,359, 93 S.Ct. 1001, 1003, 35 L.Ed.2d 351 (1973) (footnote omitted).
 "In Madden v. Kentucky, 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590, a State laid an ad valorem tax of 50¢ per $100 on deposits in banks outside the State and only 10¢ per $1,000 on deposits within the State. The classification was sustained against the charge of invidious discrimination, the Court noting that 'in taxation, even more than in other fields, legislatures possess the greatest freedom in classification.' Id., at 88, 60 S.Ct., at 408. There is a presumption of constitutionality which can be overcome 'only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.' Ibid. And the Court added, 'The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' Ibid. That idea has been elaborated. Thus, in Carmichael v. Southern Coal Co., 301 U.S. 495, 57 S.Ct. 868, 81 L.Ed. 1245, the Court, in sustaining an unemployment tax on employers, said:
 " 'A state legislature, in the enactment of laws, has the widest possible latitude within the limits of the constitution. In the nature of the case it cannot record a complete catalogue of the considerations which move its members to enact laws. In the absence of such a record courts cannot assume that its action is capricious, or that, with its informed acquaintance with local conditions to which the legislation is to be applied, it was not aware of facts which afford reasonable basis for its action. Only by faithful adherence to this guiding principle of judicial review of legislation is it possible to preserve to the legislative branch its rightful independence and its ability to function.' Id., at 510, 57 S.Ct., at 872."
Id., 410 U.S. at 364-365, 93 S.Ct. at 1006 (footnote omitted). See, also, City of New Orleans v. Dukes,427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976).
The above-quoted standards of review were also applied inExxon Corp. v. Eagerton, 462 U.S. 176, 195-96,103 S.Ct. 2296, 2308, 76 L.Ed.2d 497 (1983).
In equal protection analysis of challenges to tax statutes, the basic test is that a classification for taxing purposes will be upheld if it is rationally related to a legitimate state purpose, "a relationship that is not difficult to establish." Metropolitan Life Ins. Co., supra,470 U.S. at 881, 105 S.Ct. at 1683; Western Southern LifeIns. Co. v. State Board of Equalization, 451 U.S. 648,101 S.Ct. 2070, 68 L.Ed.2d 514 (1981); Baldwin v. Montana Fish Game Comm'n, 436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354
(1978); Hughes v. Alexandria Scrap Corp.,426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976).
 "In determining whether a challenged classification is rationally related to achievement of a legitimate state purpose, we must answer two questions: (1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose?"
Western Southern Life Ins. Co. v. State Bd. ofEqualization, 451 U.S. 648, 668, 101 S.Ct. 2070, 2083,68 L.Ed.2d 514 (1981).
This case is unlike Metropolitan Life Ins. Co. v. Ward,supra, because that case involved premium taxes that were facially discriminatory against foreign insurance companies: a three or four percent rate *Page 382 
was imposed on premiums collected by foreign companies, but only a one percent rate was imposed on domestic companies. Here, a finding of discriminatory treatment cannot be made from the face of the statutes themselves, but only by consideration of the effect of the taxes.
 Commerce Clause
The Commerce Clause provides: "The congress shall have power to . . . regulate commerce . . . among the several states." U.S. Const. Art. I, § 8, cl. 3. The prohibitions of the Commerce Clause apply even in the absence of action by Congress on the principle that the clause itself prohibits an undue burden on interstate commerce by the states. Boston StockExchange v. State Tax Comm'n, 429 U.S. 318, 97 S.Ct. 599,50 L.Ed.2d 514 (1977); Freeman v. Hewit, 329 U.S. 249,67 S.Ct. 274, 91 L.Ed. 265 (1946).
"No state, consistent with the Commerce Clause, may 'impose a tax which discriminates against interstate commerce . . . by providing a direct commercial advantage to local business.' "Boston Stock Exchange, 429 U.S. at 328,97 S.Ct. at 605, quoting Northwestern States Portland Cement Co. v.Minnesota, 358 U.S. 450, 458, 79 S.Ct. 357, 362,3 L.Ed.2d 421 (1959); Westinghouse Elec. Corp. v. Tully,466 U.S. 388, 403, 104 S.Ct. 1856, 1865, 80 L.Ed.2d 388 (1984).
The Court has recently changed its analysis of the application of this clause to tax statutes. The current test is that a tax must (1) have a sufficient nexus to the taxing state, (2) be fairly apportioned, (3) not discriminate against interstate commerce, and (4) be reasonably related to the services provided by the taxing state. As part of the apportionment test, the Court has held that a tax must be internally consistent, that is, that it must be susceptible of application by all of the states without burdening interstate commerce. Amerada Hess Corp. v. Director, Div. of Taxation,New Jersey Dept. of the Treasury, ___ U.S. ___,109 S.Ct. 1617, 104 L.Ed.2d 58 (1989); Goldberg v. Sweet,488 U.S. 252, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989); AmericanTrucking Ass'ns, Inc. v. Scheiner, 483 U.S. 266,107 S.Ct. 2829, 97 L.Ed.2d 226 (1987); Armco Inc. v. Hardesty,467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984);Commonwealth Edison Co. v. Montana, 453 U.S. 609,101 S.Ct. 2946, 69 L.Ed.2d 884 (1981); Complete Auto Transit,Inc. v. Brady, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326
(1977).
 Applications of the Standards to this Case
We note here that the ultimate question in applying either equal protection or commerce clause analysis to these facts is virtually the same. The foreign corporation franchise tax has a nexus to this state and is apportioned fairly, because only such portion of the corporation's capital as is employed in this state forms the base for the franchise tax. It is reasonably related to services provided by this state, because the corporate function depends upon the provision of services such as roads, police and fire protection, etc. Therefore, the only element of the commerce clause test that is at issue here is the discrimination against interstate commerce test. While there are certain differences between this test and the test for application of the Equal Protection Clause, they are sufficiently similar that the bulk of our analysis will not treat them separately.
The question, as we see it, is whether the franchise tax on foreign corporations invidiously discriminates against them by imposing a grossly disproportionate tax on them for no other reason than to provide a competitive advantage to domestic corporations. We emphasize the term "invidiously" because the tax will be sustained if its classifications are rationally related to a legitimate state purpose and because, in enacting taxing statutes, legislatures are not required to reach equality with mathematical precision.
 "[A] statutory classification impinging upon no fundamental interest, and especially one dealing only with economic matters, need not be drawn so as to fit with precision the legitimate purposes animating it. Williamson v. Lee Optical Co., 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). That [a state] might *Page 383 
have furthered its underlying purpose more artfully, more directly, or more completely, does not warrant a conclusion that the method it chose is unconstitutional. See Katzenbach v. Morgan, 384 U.S. 641, 657, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828 (1966)."
Hughes v. Alexandria Scrap Corp., 426 U.S. 794, 813,96 S.Ct. 2488, 2499, 49 L.Ed.2d 220 (1976); Lehnhausen v.Lake Shore Auto Parts, supra; Allied Stores of Ohio, Inc. v.Bowers, supra.
The guiding principles for courts to apply when legislative acts are challenged as unconstitutional were ably expressed inAlabama State Federation of Labor v. McAdory, 246 Ala. 1,9, 18 So.2d 810, 815 (1944):[7]
 "Uniformly, the courts recognize that this power is a delicate one, and to be used with great caution. It should be borne in mind, also, that legislative power is not derived either from the state or federal constitutions. These instruments are only limitations upon the power. Apart from limitations imposed by these fundamental charters of government, the power of the legislature has no bounds and is as plenary as that of the British Parliament. It follows that, in passing upon the constitutionality of a legislative act, the courts uniformly approach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government. All these principles are embraced in the simple statement that it is the recognized duty of the court to sustain the act unless it is clear beyond reasonable doubt that it is violative of the fundamental law. State ex rel. Wilkinson v. Murphy, 237 Ala. 332, 186 So. 487."
See, also, Home Indemnity Co. v. Anders, 459 So.2d 836
(Ala. 1984); Crosslin v. City of Muscle Shoals,436 So.2d 862 (Ala. 1983); Thorn v. Jefferson County,375 So.2d 780 (Ala. 1979); Mobile Housing Bd. v. Cross,285 Ala. 94, 229 So.2d 485 (1969).
Thus, when testing the constitutionality of a statute, the only question for the Court to decide, under the constitutional separation of powers, is one of legislative power, not of legislative expediency or legislative wisdom. All questions of propriety, wisdom, necessity, utility, and expediency are exclusively for the legislature to determine and are matters with which the courts have no concern. Alabama StateFederation of Labor v. McAdory, supra; Fireman's Fund AmericanIns. Co. v. Coleman, 394 So.2d 334, 352-53 (Ala. 1980) (Shores, J., concurring in the result); Reed v.Brunson, 527 So.2d 102, 116 (Ala. 1988); Friday v.Ethanol Corp., 539 So.2d 208, 211 (Ala. 1988).
Our legislature is faced with a difficult problem of imposing a franchise tax, because §§ 229 and 232 prescribe different methods of imposing the tax. Section 229 makes no allowance for apportionment of the domestic corporation franchise tax according to the amount of a corporation's capital stock that is attributable to activities within the state, while § 232 requires such an apportionment for foreign corporations, as it must under the Commerce Clause. The problem is compounded by the historical developments that "capital stock" in § 229 was held to mean only paid-in capital stock and that that measure of capital stock is no longer as appropriate a measure of the actual capitalization of a corporation as it was when the first franchise tax statutes were enacted pursuant to §§ 229 and 232.
Thus, we find that the plaintiffs' claims of unequal treatment and discrimination against them are answered by two factors in the record that are not taken into account in the opinion of the trial court or that of the Court of Civil Appeals, and which presumably have been taken into account by the legislature in its efforts to enact nondiscriminatory taxes. The first is that, while it is true that there are more domestic corporations doing business in this State than there are foreign corporations doing business in this State and that, as is shown in the opinions below, those *Page 384 
domestic corporations paid less tax, it is also true that the foreign corporations, although smaller in number, actually employ more capital in this state than domestic corporations do. The second is that the discrepancy in the franchise tax diminishes substantially when the tax on the stock of domestic corporations is taken into account.
Both of these points are illustrated by the affidavit of Ernest Broadhead:
 "My name is Ernest J. Broadhead. I am presently the Chief of the Franchise Tax Division of the Alabama State Revenue Department, which office I have held since July, 1983. In this position, I have become acquainted with the taxation of foreign and domestic corporations for franchise tax purposes in Alabama. Foreign corporations pay franchise tax based on their capital employed in the State of Alabama and pay no tax on their corporate shares of stock, whereas domestic corporations pay both a franchise tax based on the amount of their capital stock and a share stock tax which is an ad valorem tax on the corporate shares of stock. While the legal incidence of the share tax is on the stockholder, in practice the share tax is always paid by the corporation. I know of no incidence in which the share stock tax has been paid by the shareholder as opposed to the corporation. The following table shows the impact of the share tax in Alabama:
 "1. Number of domestic share tax assessments by year
 "2. Estimated total tax using average state millage rate (.038)
"3. Estimated average per corporation.

 "1987 1986 1985
1984
 "1. 45,048 42,902 41,348 39,501
 "2. $13,563,668 $11,470,954 $11,197,983 $11,517,468
 "3. 301.09 267.37 270.82 291.57

 "The above figures are conservative because they are based on the statewide tax rate of 38 mills. Proportionally more corporations are located in larger metropolitan areas which usually have higher millage rates. For instance, the millage rate as of October 1, 1986, in Huntsville was 68.5; in Birmingham was 70.6; in Mobile was 51.5; and in Montgomery was 34.5.
 "The study conducted by the Department of Revenue, which is a part of the record in this case, shows that for the tax year 1983, 38,772 domestic corporations and 11,234 foreign corporations paid franchise taxes. Had both the foreign and domestic corporations paid franchise taxes based on the capital employed in this state at the rate of $3.00 per $1,000.00 capital employed, an average domestic corporation would have paid $991.70, while an average foreign corporation would have paid $4,148.79. This shows that foreign corporations on average employ in excess of four times the amount of capital in this state as domestic corporations. It further shows that all the capital employed by all the domestic corporations in this state is only 45% of the amount employed by all foreign corporations. It can be seen from this that one of the reasons that the average tax for foreign corporations exceeds that of domestic corporations is that the foreign corporations are bigger and employ more capital and that many of the domestic corporations are small by comparison to the foreign corporations.
 "It has been my experience that foreign corporations can manipulate the amount of franchise taxes they pay in Alabama merely by forming domestic corporate subsidiaries to do business in this state or by becoming Alabama corporations themselves."
The State filed a brief in support of its motion for summary judgment that included the following argument based on Broadhead's affidavit:
 "Before a tax is subject to the rational basis test, the Taxpayer must initially show that discrimination exists. The Taxpayers have attempted to do this *Page 385 
through the use of statistics showing that Alabama receives more franchise taxes on average from foreign corporations than it does from domestic corporations. While this may be true, it is also true that a particular corporation's franchise tax liability is determined by its capital structure and corporate make-up, and it also depends to a large extent on the size of the corporation. The Affidavit of Ernest J. Broadhead, Chief of the Franchise Tax Division, Department of Revenue, shows that for the tax year 1983, 38,772 domestic corporations and 11,234 foreign corporations paid franchise taxes. Had both the foreign and domestic corporations paid franchise taxes based on the capital employed in this state at the rate of $3.00 per $1,000 of capital employed, an average domestic corporation would have paid $991.70, while an average foreign corporation would have paid $4,148.79. What these figures mean is that foreign corporations on average employed in excess of four times the amount of capital in this state as domestic corporations. This accounts for some of the discrepancy between what an average foreign corporation pays in franchise taxes and what an average domestic corporation pays in franchise taxes. The Affidavit also shows that all the capital employed by all the domestic corporations in this state constitutes only 45% of the amount employed by all foreign corporations. It can readily be seen from this that one of the reasons that the average tax for foreign corporations exceeds that of domestic corporations is that the foreign corporations are bigger and employ more capital and that many of the domestic corporations are small by comparison to the foreign corporations doing business within the State of Alabama.
 "This fact can be illustrated using the statistics in the record in this case. Assume that the capital employed by a corporation in Alabama is indicative of its size and that therefore foreign corporations are on average approximately 4.5 times as large as domestic corporations ($4,148.00 versus $991.00). Exhibit B to the Rawls Brief shows that for the year 1985, an average domestic corporation paid $303.28 in franchise taxes while an average foreign corporation paid $3,685.40 in franchise taxes. Assume, however, that the domestic corporation also paid $270.82 in share taxes, as shown by the Affidavit of Broadhead attached to the State's Motion for Summary Judgment. Adding the $303.28 to the $270.82 gives a sum of $574.10 in total taxes paid by the domestic corporation. If you multiply the $574.10 paid by domestic corporations times a factor of 4.5 to take into account the discrepancy between the relative sizes of domestic versus foreign corporations, the domestic corporation, were it the same size as the foreign corporation, would have paid $2,583.45 in taxes, as opposed to the $3,685.40 paid by the foreign corporation. While these two amounts are not equal, the discrepancy between the two in no way approaches the discrimination which the Plaintiffs would have this Court believe exists.
 "The figures for the 1984 tax year are even more compelling. In that year domestic corporations paid a total of $325.29 in franchise taxes and $291.57 in corporate share taxes, for a total of $616.86. If one multiplies this figure times the factor of 4.5 one may see that a domestic corporation of a size comparable to an average foreign corporation would pay a total of $2,815.87 in taxes. A foreign corporation in that same year paid on average $3,323.08 in franchise taxes. The domestic share tax figures are estimates based on the average statewide tax rate of 38 mills. It stands to reason that proportionally more corporations are located in the large metropolitan areas, which have a higher millage rate. For instance, as of October, 1986 Huntsville had a millage rate of 68.5; Birmingham had a rate of 70.6; Mobile had a rate of 51.5 and Montgomery had a rate of 34.5. Had the estimates been weighted toward the higher millage rates which exist in the larger cities, the figures might well show that the total tax paid by domestic corporations equals that *Page 386 
of foreign corporations. In short, the apparent discrimination argued by the Plaintiffs does not in reality exist.
 "The Taxpayers make much of the fact that domestic corporations can manipulate the amount of franchise tax they must pay by reducing the amount of their capital stock. However, foreign corporations can likewise manipulate the amount of franchise taxes they must pay merely by forming domestic corporate subsidiaries or by becoming domestic corporations themselves. According to Broadhead, this has in fact been done."
We note that Broadhead inadvertently stated that his figures showed that domestic corporations employed only 45% of the capital employed by foreign corporations. What his figures in fact show is that domestic corporations employ 45% of the entire capital employed in the state by corporations while foreign corporations employ 55%.[8]
Broadhead's affidavit shows that his estimates of the stock tax are almost certainly low, because Birmingham, Huntsville, and Mobile have tax rates[9] that are substantially higher than the average figure used in Broadhead's calculations, and those three cities would certainly have the greatest concentration in the state of domestic corporations with high values of corporate stock. This means both that the figures in Broadhead's affidavit for tax paid by domestic corporations are low and that the calculation of the exact amounts would be so difficult that deference to the legislative judgment on the method for equalizing the relative burdens on domestic and foreign corporations is in order.
Perhaps the most significant fact about these calculations is that they are based on figures that Broadhead derived by examining domestic corporations' stock tax returns. This illustrates the point that the legislature has instituted the domestic stock tax to overcome the perceived restrictions imposed by § 229 (the absence of an apportionment provision and the "paid-in capital" interpretation) and to reach a tax base that is more nearly equivalent to that of foreign corporations. Also of great significance is the fact that, in deriving a hypothetical "capital employed" franchise tax for domestic corporations, Broadhead was not able to apply an allocation factor:
 "The one factor . . . that we were not able to include that would normally be a part of this is the allocation. So an assumption was made that all of the tax was — on these generally smaller domestic corporations were Alabama firms or had a one hundred percent capital employment factor in Alabama."
Thus, his figure of $991 as a "capital-employed" tax on domestic corporations is obviously high, and the discrepancy between the capital employed by domestic and foreign corporations is larger than his calculations show it to be and, correspondingly, the discrepancy in allocation of the tax burden is smaller than his calculations show it to be.
The point that the legislature has designed the domestic stock tax to complement the foreign franchise tax is made also by a comparison of § 40-14-41 with § 40-14-70. Although the definition of capital in § 40-14-41(b) is somewhat different from the factors set out in § 40-14-70(a) and (c) to be used in valuing a domestic corporation's stock, those methods of valuation reach largely the same elements of corporate worth. The investments of domestic corporations in other states are deducted from the value of the corporate stock before the tax is calculated, § 40-14-70(d)(1), so the domestic stock tax is apportioned to some degree as the foreign corporation franchise tax is apportioned. Another fact that shows that the *Page 387 
legislature has treated the stock tax on domestic corporations as corresponding to the franchise tax on foreign corporations is that recent amendments have added the same deductions to both taxes. Sections 40-14-41(d)(2)c and 40-14-70(d)(1) allow deductions for investments in air and water pollution control devices. Sections -41(d)(2)d and -70(d)(3) allow deductions for investments in "qualifying counties," that is, counties with high unemployment rates. Furthermore, the Department of Revenue administers the corporate stock tax through a Shares Tax Section within the Franchise Tax Division.
The United States Supreme Court has upheld taxing statutes that appeared to discriminate against interstate commerce by holding that the state's tax scheme compensated for the tax by a substantially equivalent tax on intrastate commerce.Gregg Dyeing Co. v. Query, 286 U.S. 472, 52 S.Ct. 631,76 L.Ed. 1232 (1932) (use tax on out-of-state purchases brought into state compensated for by sales tax on instate purchases);Alaska v. Arctic Maid, 366 U.S. 199, 81 S.Ct. 929,6 L.Ed.2d 227 (1961) (exemption from tax on Alaska fish catches for fish to be canned in Alaska justified because of tax on Alaska fish canners); Public Util. Dist. v.Washington, 82 Wn.2d 232, 510 P.2d 206, appeal dismissed for want of a substantial Federal question, 414 U.S. 1106,94 S.Ct. 833, 38 L.Ed.2d 734 (1973) (deduction, from tax on sale of electric power, for sales for resale within state not discriminatory because resales within state would be subject to the same tax).
The above-cited cases are analyzed at J. Hellerstein,State Taxation, vol. 1, "Corporate Income and Franchise Taxes," paragraph 4.12[5], pp. 147-48 (1983). Hellerstein questions the rationales of such cases at pages 149-51 and, in the 1988 cumulative supplement, notes that more recent United States Supreme Court cases have not allowed the comparison of complementary taxes to validate taxes that, by themselves, impose an undue burden on interstate commerce.American Trucking Ass'ns, Inc. v. Scheiner,483 U.S. 266, 107 S.Ct. 2829, 97 L.Ed.2d 226 (1987); Tyler PipeIndustries, Inc. v. Washington State Dep't of Revenue,483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987); Armco,Inc. v. Hardesty, 467 U.S. 638, 104 S.Ct. 2620,81 L.Ed.2d 540 (1984); Maryland v. Louisiana, 451 U.S. 725,101 S.Ct. 2114, 68 L.Ed.2d 576 (1981).
Hellerstein elsewhere says, however, that a capital stock tax is a corporate franchise tax:
 "The capital stock tax, which has had a long history in State taxation, has its roots in the property tax. The earliest form of general corporation tax in this country, the corporate excess tax, was not a special tax but a modification of the general property tax. It was a levy on the value of a corporate business in excess of the value of its assets. The excess included goodwill, doing business value, and other factors that are reflected in the market value of the corporation's stock. At first, this intangible 'corporate excess' value was assessed and taxed to the shareholders. Subsequently, it was levied on the corporations themselves. This form of corporate taxation has largely given way to the capital stock tax.
 "The capital stock tax is typically an annual franchise tax, imposed on domestic corporations for the privilege of existing as a corporation, and on foreign corporations for the privilege of doing business, or the actual conduct of business, within the taxing State. It is usually measured by the value of the business as a going enterprise, determined on a book value basis, although in some States an attempt is made to utilize the market value."
Hellerstein, op cit., paragraph 11.1, pp. 691-92 (footnotes omitted).
Because of the perceived restrictions in our Constitution, the legislature has divided the franchise tax on domestic corporations into the "franchise tax" as such and the corporate stock tax. No such restrictions exist with respect to foreign corporations, so the franchise tax on those corporations has not been so divided. There is no *Page 388 
stock tax on foreign corporations in Alabama.
When the franchise tax on foreign corporations is compared to the aggregate of the franchise tax and the corporate stock tax on domestic corporations, taking into account the large amount of capital employed in this state by foreign corporations and the relatively smaller amount employed by domestic corporations, the alleged unequal treatment of and discrimination against foreign corporations diminishes to a point that no discrimination of constitutional significance exists. The legislature is not required to reach equality with mathematical exactness, and legislation will be presumed constitutional unless shown otherwise by clear and convincing proof.
Even assuming that the lack of uniformity in the taxes on domestic and foreign corporations rose to a level of discrimination that would invoke equal protection or commerce clause analysis, we would hold that § 40-14-41 does not violate those provisions, for the following reasons.
The Court held in Louisville N. R.R. v. State,supra, that the purpose behind §§ 229 and 232 and the taxes enacted pursuant thereto was to collect franchise taxes that did not discriminate against foreign corporations. That is concededly a legitimate state purpose. We find that the purpose behind the historical amendments to the foreign corporation franchise tax, the domestic corporation franchise tax, and the domestic corporation stock tax has been to maintain that lack of discrimination as nearly as was feasible within the framework imposed on the legislature by §§ 229 and 232 and the cases interpreting them. In determining whether "it was reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose,"Western Southern Life, supra, we need only inquire whether the legislature engaged in "invidious" or "hostile and oppressive discrimination," Lehnhausen, supra.
There is no showing of invidious discrimination or hostile purpose. Rather, a tax that was originally imposed under an express state constitutional mandate not to discriminate against foreign corporations, and that originally did not so discriminate, developed, in its application and over time, to be somewhat more discriminatory. This came about, not through an increase of the tax on foreign corporations, but by a decrease of taxes paid under the franchise tax by domestic corporations. The decrease of the domestic franchise tax came about, not through legislative action, but through actions taken by domestic corporations to pay less money in franchise taxes.
It can be seen that the legislature, rather than invidiously fostering any such discrimination, took steps within the perceived restrictions of the Alabama Constitution to offset any unequal treatment, primarily by the use of the corporate stock tax. In the ongoing efforts to maintain the constitutionally required level of equal treatment, certain legislators introduced bills in the 1983 session that would have proposed an amendment to § 229 of the Constitution and thereby imposed a capital-employed franchise tax on domestic corporations. When it became clear that those bills were not likely to pass, the legislature substituted a bill that raised the rate and the minimum for the franchise tax on domestic corporations.
Other than the bare fact of that legislative activity in 1983, there is no evidence that, prior to the institution of this lawsuit, the legislature had any indication that its chosen means of implementing the corporate franchise taxes was not reasonably related to the purpose of imposing a nondiscriminatory tax system. Indeed, the evidence that was developed in this case shows that consideration of the relative amounts of capital employed (even under Broadhead's unapportioned analysis of a capital-employed tax on domestic corporations), together with the domestic stock tax, brings the relative tax burdens much closer than they would appear to be under the isolated facts cited in the opinion of the Court of Civil Appeals.
The Court of Civil Appeals quoted the trial court's statement that, aggregating the taxes paid and the returns filed in 1982 and 1983, 29,000 foreign corporations paid *Page 389 
$94,000,000 in franchise taxes while 82,000 domestic corporations paid less than $10,000,000. Using these figures alone, one would conclude that the average foreign corporation paid 26.6 times more tax than the average domestic corporation. However, once Broadhead's calculations of the relative amounts of capital employed by domestic and foreign corporations (45% by the 38,772 domestics and 55% by the 11,234 foreigns filing returns in 1983) and the domestic stock tax are factored in, the relative burdens are not so disproportionate that we can say that the legislative taxing method is not rationally related to the purpose of enacting a non-discriminatory tax.
Furthermore, the plaintiffs in this case have not presented sufficient evidence under Lehnhausen, supra, to negate a number of legitimate purposes of the present legislation that are apparent to this Court and that are reasonably likely to be promoted by the statutory distinction. Legitimate purposes for the statutory distinction between foreign and domestic corporations could certainly include, in addition to the mandate of the Alabama Constitution, ease of regulation and enforcement, differences in the utilization of state natural resources between foreign and domestic corporations, and differences in the employment of state residents and utilization of state services between foreign and domestic corporations.
With respect to the purpose of ease of regulation and supervision, we are aware that the legislature has enacted various provisions for the dissolution of domestic corporations or for proceeding against individual shareholders for collection of taxes that cannot apply to foreign corporations. The United States Supreme Court has held that ease of regulation can serve as a rational basis for a distinction between "persons" under equal protection analysis. See G.D.Searle Co. v. Cohn, 455 U.S. 404, 102 S.Ct. 1137,71 L.Ed.2d 250 (1982) (difficulty of obtaining jurisdiction over nonresident corporation justified distinction in statute of limitations); Madden v. Kentucky, 309 U.S. 83,60 S.Ct. 406, 84 L.Ed. 590 (1940) (differences in ability to enforce state remedies justifies different treatment of foreign organizations); Metropolitan Casualty Ins. Co. v.Brownell, 294 U.S. 580, 55 S.Ct. 538, 79 L.Ed. 1070 (1935) (domicile of insurer relevant to limitations statutes because such insurers' offices were generally located outside of the state); Board of Education v. Illinois, 203 U.S. 553,27 S.Ct. 171, 51 L.Ed. 314 (1906) (state's greater control over domestic corporations justified a discriminatory inheritance tax as to foreign corporations).
Thus, we hold that § 40-14-41 does not violate the Equal Protection Clause.
Turning to the Commerce Clause, we must inquire whether the taxes in question impose an undue burden on interstate commerce. The weighing of factors pertinent to the franchise taxes and the corporate stock tax leads to case-by-case differences as to whether Alabama citizens wishing to incorporate a business would find it advantageous to form an Alabama corporation or to incorporate in another state. At oral argument, the amicus curiae indicated that, for example, if a business has large intangible assets, the domestic stock tax would be so burdensome that the incorporators would inevitably choose to incorporate in another state, such as Delaware.
These considerations are affected by the kind of business the corporation would be doing in this state and by the nature of its assets, not by the distinction between intrastate business and interstate business. The same considerations would apply to the decision of a foreign corporation in deciding whether to form a subsidiary Alabama corporation to conduct its business here or to conduct its business through a division of the existing corporation.[10]
In the United States, which has 50 sovereigns that tax corporations, there will inevitably be incentives for incorporating in one state for certain types of business and in *Page 390 
other states for other types of business, regardless of the actual place of doing business or the interstate or intrastate nature of that business. Are the Delaware tax laws that provide incentives for many businesses to incorporate there necessarily unconstitutional? We think not. Similarly, the Alabama tax laws that in some cases favor domestic incorporation and in others favor doing business here as a foreign corporation cannot be said to violate the Commerce Clause. We note that Broadhead, in response to GMAC's requests for admissions, said that if GMAC had been taxed in 1986 as a domestic corporation instead of as a foreign one, it would have paid $21,650,000 under §40-14-40 instead of the $1,370,427 it paid under §40-14-41.
Thus, Alabama's taxation of domestic and foreign corporations does not violate the Commerce Clause.
For the foregoing reasons, we hold that there is no unconstitutional unequal treatment of foreign corporations and no unconstitutional discrimination against them. Therefore, § 40-14-41 does not offend either the Equal Protection Clause or the Commerce Clause. The judgment of the Court of Civil Appeals is therefore reversed, and a judgment is hereby rendered for the State on its motion for summary judgment.
REVERSED AND JUDGMENT RENDERED.
HORNSBY, C.J., and MADDOX, JONES, SHORES, ADAMS, HOUSTON, STEAGALL and KENNEDY, JJ., concur.
[1] The pertinent language of §§ 229 and 232 was not changed by the amendments to those sections; the language quoted is the same as originally adopted in 1901, except that Amend. 473 dropped the word "any" as a modifier of "business" where that word first appears in § 232.
[2] Section 40-14-41.1 imposes on "every corporation required by sections 40-14-40 and 40-14-41 to pay an annual franchise tax . . . an additional annual franchise tax of $.06 on each $1,000.00 of its capital stock or of the actual amount of its capital employed in this state." (Emphasis added.)
[3] Appeal dismissed, 248 U.S. 533, 39 S.Ct. 18, 63 L.Ed. 406
(1918).
[4] The United States Supreme Court upheld, against equal protection, commerce clause, and due process challenges, Alabama's non-apportioned tax on the capital stock of a domestic corporation doing a majority of its business in Tennessee and Mississippi. Kansas City, Memphis, Birmingham R.R. v. Stiles, 242 U.S. 111, 37 S.Ct. 58,61 L.Ed. 176 (1916). The Report of the Special Subcommittee on State Taxation of Interstate Commerce of the Committee on The Judiciary, House of Representatives, June 30, 1965, Vol. 3, Part IV, "Capital Stock Taxes," p. 909, concludes its discussion of the lack of a requirement of apportionment of states' taxes on domestic corporations by stating: "Today more than half of the capital stock tax States allow apportionment, but in seventeen of thirty-seven States domestic corporations must still pay tax measured by their entire capital." (Footnote omitted.)
[5] That principle from Bradley was enacted into the franchise tax article and is now found at § 40-14-56.
[6] Previous versions of the franchise taxes and the corporate stock tax had also been enacted in General Revenue Acts that were, according to the practice of the time, not codified. In their present codification, they trace to the Act of 1935.
[1] "Alabama, Arkansas, Colorado, Connecticut, Delaware, Florida, Georgia, Idaho, Illinois, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Nebraska, New Hampshire, New Jersey, New Mexico, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, and West Virginia.
[2] "As in other parts of this report, the District of Columbia is treated hereafter as a State."
[7] Appeal dismissed, 325 U.S. 450, 65 S.Ct. 1384,89 L.Ed. 1725 (1945).
[8] As follows: 38,772 domestic corporations x $991.70 average tax on a capital-employed base at a 3-mill rate = $38,450,192.40 total domestic franchise tax; 11,234 foreign corporations x $4,148.79 average tax on the same base and rate = $46,607,506.86 total foreign franchise tax. $38,450,192.40 is 45.2% of the $85,057,699.26 total franchise tax. Because the tax in these calculations varies only with capital employed, the proportionate shares of capital employed would be the same as the proportionate shares of tax.
[9] The state and county millage rates are constant, so only the municipal rates vary.
[10] The fact that, when circumstances make it to their advantage to do so, foreign corporations can and do use subsidiaries to minimize payment of franchise taxes is recognized and allowed in Consolidated Coal Co. v.State, 236 Ala. 489, 183 So. 650 (1938); and State v.Pullman-Standard Car Mfg. Co., 235 Ala. 493, 179 So. 541
(1938).