584 So.2d 1367 (1991)
Guy HUNT, as Governor of the State of Alabama
v.
CHEMICAL WASTE MANAGEMENT, INC.
James M. SIZEMORE, Jr., as Commissioner of the Alabama Department of Revenue; and the Alabama Department of Revenue
v.
CHEMICAL WASTE MANAGEMENT, INC.
CHEMICAL WASTE MANAGEMENT, INC.
v.
The ALABAMA DEPARTMENT OF REVENUE, et al.
1901043, 1901044 and 1901106.
Supreme Court of Alabama.
July 11, 1991.
*1369 Bert S. Nettles, Alton B. Parker, Jr. and Kenneth O. Simon of Spain, Gillon, Grooms, Blan & Nettles, Birmingham, and H. William Wasden, Legal Advisor to the Governor, Montgomery, for appellant Governor Guy Hunt.
William D. Coleman and Jim B. Grant, Jr., of Capell, Howard, Knabe & Cobbs, Montgomery, for appellant James M. Sizemore, Jr., Com'r of Revenue.
J. Wade Hope, Montgomery, for appellant Alabama Dept. of Revenue.
Fournier J. Gale III, H. Thomas Wells, Jr. and J. Alan Truitt of Maynard, Cooper, Frierson & Gale, Birmingham, and Oakley Melton of Melton, Espy, Williams and Hayes, Montgomery, for appellee/cross-appellant Chemical Waste Management, Inc.
SHORES, Justice.
In April 1990, the Alabama Legislature enacted Act No. 90-326 (the "Act"), effective July 15, 1990, Code of Ala. 1975, § 22-30B-1 et seq. (Supp.1990), which was signed into law by the Governor. The Act imposes two fees on the disposal of hazardous waste at commercial facilities in Alabama. A "Base Fee" of $25.60 per ton was imposed on all waste and substances disposed of at commercial facilities, regardless of the state of origin. An "Additional Fee" of $72.00 per ton was imposed on all waste and substances generated outside the State of Alabama and disposed of at Alabama facilities.
The Act also included a "Cap" provision, limiting the amount of hazardous waste that can be disposed of at any affected facility in any one-year period. Under the Cap provision, the amount of hazardous waste disposed of during the first year that the Act's new fees are in effect (the "benchmark period"), becomes the permanent ceiling in subsequent years. The Cap provision applies only to commercial facilities that dispose of over 100,000 tons of waste per year. The facility at Emelle, Alabama, is the only facility in this category.
On June 5, 1990, Chemical Waste Management, Inc. ("CWM"), filed suit for declaratory relief against the Alabama Department of Revenue, James M. Sizemore, Jr., as Commissioner, and Guy Hunt as Governor ("the State"). The suit challenged the constitutionality of Act No. 90-326, *1370 Code of Alabama 1975, § 22-30B-1 et seq. CWM alleged that the provisions of the Act violate the Commerce Clause of the United States Constitution; the Equal Protection Clause of the United States Constitution and its equivalents under the State Constitution; and the Due Process Clause of the State Constitution. CWM further contends that the Act is a "revenue bill" enacted during the last five days of the legislative session in violation of Article IV, § 70, of the Alabama Constitution. CWM further contends that the Cap provision violates the Commerce, Due Process, and Equal Protection Clauses of the United States Constitution and is preempted by various federal statutes.[1]
CWM also sought a preliminary and permanent injunction enjoining the State from enforcing, applying, or attempting to enforce the Act. Dr. Claude Earl Fox, state health officer, was allowed to intervene on behalf of the State Board of Health.
Governor Hunt filed a counterclaim for declaratory relief, asking that the trial court find and declare the Act constitutional. On February 28, 1991, the trial judge, the Honorable Joseph D. Phelps, declared the Base Fee and Cap provisions of the Act to be valid and constitutional. However, he declared the Additional Fee imposed on out-of-state generated waste to be impermissible and invalid as a violation of the Commerce Clause of the United States Constitution.
The State appeals only that aspect of the trial judge's order pertaining to the Additional Fee. CWM appeals from the trial judge's holding that the Base Fee and Cap are constitutional. We affirm the trial judge's holdings that the Base Fee and Cap provisions of the Act are valid and constitutional. We reverse the holding of the trial judge that the Additional Fee violates the Commerce Clause.
The legislative findings underlying Act No. 90-326, as quoted by the trial judge in his order of February 28, 1991, are as follows:
"Act § 1, Code § 22-30B-1.1 Legislative findings.
"The Legislature finds that:
"(1) The state is increasingly becoming the nation's final burial ground for the disposal of hazardous wastes and materials;
"(2) The volumes of hazardous wastes and substances disposed in the state have increased dramatically for the past several years;
"(3) The existence of hazardous waste disposal activities in the state poses unique and continuing problems for the state;
"(4) As the site for the ultimate burial of hazardous wastes and substances, the state incurs a permanent risk to the health of its people and the maintenance of its natural resources that is avoided by other states which ship their wastes to Alabama for disposal;
"(5) The state also incurs other substantial costs related to hazardous waste management including the costs of regulation of transportation, spill cleanup and disposal of ever increasing volumes of hazardous wastes and substances;
"(6) Because all waste and substances disposed at commercial sites for the disposal of hazardous waste and hazardous substances, whether or not such waste and substances are herein defined as hazardous, contribute to the continuing problems created for the state, and because state and federal definitions of `hazardous wastes' have regularly changed and are likely to change in the future to include waste not previously defined as hazardous, it is necessary that all waste and substances disposed of at a commercial site for the disposal of hazardous waste or hazardous substances be included within the requirements of this act;
"(7) The legislature finds that the public policy of the state is to encourage business and industry to develop technology *1371 that will eliminate the generation of hazardous waste and substances....
"(8) Since hazardous wastes and substances generated in the state compose a small proportion of those materials disposed of at commercial disposal sites located in the state, present circumstances result in the state's citizens paying a disproportionate share of the costs of regulation of hazardous waste transportation, spill cleanup and commercial disposal facilities. Persons, firms or corporation which generate and dispose of such waste and substances in Alabama presently are among the taxpaying citizens of this state who must bear the burden of regulation, inspection, control and clean-up of hazardous waste sites; addressing the public health problems created by the presence of such facilities in the state; and, preserving this state's environment while those generating this waste in other states and shipping it to Alabama for disposal presently are not. This act attempts to resolve that inequity by requiring all generators of waste being disposed of in Alabama to share in that financial burden.
"(9) The operators of commercial sites for the disposal of hazardous wastes or hazardous substances have the ability to control the flow of said wastes or substances into said sites. Further, said operators, by exercise of said ability to control the flow of wastes or substances disposed at sites during a twelve-month period [need] only to enlarge the amount of wastes disposed during the next twelve-month period by a proportionate amount. The health of the population of this state and the soundness of the environment are and would be threatened by such an exercise of control. Said exercise of control could cause an artificial decrease in fees during the twelve-month period beginning July 15, 1990, and ending July 14, 1991. To prevent threats to the health of the population of this state and to the soundness of the environment of this state and to prevent an artificial decrease in fees during the twelve-month period beginning July 15, 1990, and ending July 14, 1991, this act provides a cap on the amount of hazardous waste and hazardous substances disposed during the twelve-month period beginning October 1, 1991, said cap being a function of the amount of hazardous waste and hazardous substances disposed during the twelve-month period beginning July 15, 1990, and ending July 14, 1991."
The pertinent provisions of Act No. 90-326 are as follows:
Act § 3(a), Code § 22-30B-2(a) (the Base Fee):
"In addition to other fees levied, there is hereby levied a fee to be paid by the operators of each commercial site for the disposal of hazardous waste, or hazardous substances in the amount of $25.60 per ton for all waste or substances disposed of at such site."
Act § 3(b), Code § 22-30B-2(b) (The Additional Fee):
"For waste and substances which are generated outside of Alabama and disposed of at commercial sites for the disposal of hazardous waste or hazardous substances in Alabama, an additional fee shall be levied at the rate of $72.00 per ton."
Act § 9, Code § 22-30B-2.3 (the Cap Provision):
"Any commercial site for the disposal of hazardous waste or hazardous substances that disposes of in excess of 100,000 tons of hazardous waste or hazardous substances during the twelve-month period beginning July 15, 1990, and ending July 14, 1991, (hereinafter referred to as the benchmark period) shall not, during any twelve-month period beginning October 1, 1991, and any twelve-month period thereafter, dispose of more than the tonnage received during said benchmark period. Such restriction shall be in addition to any other ban or restrictions on disposal imposed by any regulatory authority. Provided, however, that the Governor or the Governor's designee may allow disposal of hazardous wastes or hazardous substances in excess of the tonnage disposed of during the benchmark period if such action is determined by the Governor or the Governor's designee *1372 to be necessary to protect human health or the environment in the state, or to allow the state to comply with its obligations to assure disposal capacity pursuant to applicable state or federal law as determined by the Governor or his designee."
Act § 2, Code § 22-30B-1 (Definitions):
"(3) HAZARDOUS SUBSTANCE(S). Any substance defined as a hazardous substance pursuant to 42 U.S.C. § 9601(14), as amended, or listed as a hazardous waste pursuant to the Code of Alabama 1975, Section 22-30-10, as amended.
"(4) HAZARDOUS WASTE(S). Those wastes defined at Section 22-30-3(5), Code of Alabama 1975, as amended, or listed pursuant to Section 22-30-10, Code of Alabama 1975, as amended, or department regulations."
The trial judge made findings of fact in his order of February 28, 1991, which we quote below and approve:
"FINDINGS OF FACT
"1. Based on statements and representations made by the parties during pretrial proceedings, the Court accepts the legislative findings supporting Act No. 90-326. In addition, the Court finds that the evidence at trial adequately supports the legislative findings. The Court further finds that the Base Fee and Cap provisions of Act No. 90-326 which this Court determines and finds to be constitutionally permissible are integral parts of a regulatory procedure which appropriately addresses the concerns expressed by the Alabama Legislature when it enacted the `Hazardous Wastes Management Act of 1978.' The following statement of Legislative Finding, Purpose and Intent is set forth in this 1978 legislation:
"`Section 2. Legislative Finding, Purpose and Intent The Legislature finds that increasing quantities of hazardous wastes are being generated in the State and that without adequate safeguards from the point of generation through handling, processing and final disposition, such wastes can create conditions which threaten human or animal health and the environment. The Legislature, therefore, declares that in order to minimize and control any such hazardous conditions it is in the public interest to establish and to maintain a statewide program to provide for the safe management of hazardous wastes.'
"Acts 1978, 2nd Ex.Sess., No. 129, p. 1843.
"A. The Emelle Facility

"2. CWM is a Delaware corporation with its principal place of business in Oak Brook, Illinois. CWM is the owner and operator of one of the nation's oldest and largest commercial hazardous waste land disposal facilities located in Emelle, Alabama (the `Emelle facility'). The Emelle facility is a hazardous waste treatment, storage, and disposal facility operating pursuant to a permit issued by the Environmental Protection Agency (`EPA') under the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. (`RCRA') and the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq. (`TSCA'). In addition, the Emelle facility is authorized to operate under state law pursuant to interim status authority granted under Alabama Code § 22-30-12(i). The Emelle facility is the only commercial hazardous waste landfill facility currently in operation in the State of Alabama.
"3. In a 1973 study, EPA identified 74 potential sites for hazardous waste landfills throughout the country, of which Emelle was one. Although hazardous waste landfills can be designed and engineered to operate in practically every state of the United States, only a very few commercial sites presently exist. Efforts to obtain permits for new sites in other states are resisted by citizens of those states.
"4. According to the testimony presented at trial, only one additional hazardous waste landfill has been permitted in the United States since the effective date of RCRA, November 17, *1373 1980. That facility, in Last Chance, Colorado, has never operated or accepted waste and is presently for sale.
"B. The Increasing Volumes of Outof-State Wastes at Emelle

"5. Increasing amounts of out-ofstate hazardous wastes are being shipped to Emelle for permanent storage from in-state generators and from those in states throughout the country. The following tonnage has been received by Emelle in the years indicated:

"1985 .................. 341,000 tons
"1986 .................. 456,000 tons
"1987 .................. 564,000 tons
"1988 .................. 549,000 tons
"1989 .................. 788,000 tons

"The increase in tonnage has resulted in a significant increase in problems with regard to regulating and supervising the disposal of hazardous waste at Emelle. Eighty-five to ninety percent of the tonnage permanently buried at Emelle is from out-of-state. Emelle received two years ago approximately 17% of all hazardous wastes commercially landfilled in the United States.
"6. CWM estimates there is capacity at Emelle for another 100 years of operation. CWM has admitted that without the restrictions imposed by the Alabama legislature, `the total annual demand for disposal capacity at the Emelle facility for hazardous waste generated out-ofstate is projected to increase annually.' (Paragraph D of Answer of CWM to Defendant Hunt's Counterclaim.)
"7. A portion of the wastes coming to Emelle are classified as non-hazardous. Some of these non-hazardous industrial wastes are sent to the Emelle facility by industries which may be seeking to reduce their own liability should these wastes become classified as hazardous wastes in the future. Additionally, these non-hazardous wastes are commingled with the hazardous wastes that are landfilled at the Emelle facility and therefore for the purposes of long-range monitoring and potential cleanup, must be treated as hazardous waste in any event. EPA, moreover, has made limited progress in identifying hazardous wastes to be regulated and does not know whether it has identified 10% or 90% of existing hazardous wastes. As a result, wastes which today are deemed non-hazardous may very well in the future be deemed hazardous for one reason or another.
"C. The Permanent Risks and Costs of Hazardous Waste Landfilling

"8. It is without dispute that the wastes and substances being landfilled at the Emelle facility include substances that are inherently dangerous to human health and safety and to the environment. Such waste consists of ignitable, corrosive, toxic and reactive wastes which contain poisonous and cancer causing chemicals and which can cause birth defects, genetic damage, blindness, crippling and death. Should a sudden or non-sudden discharge or release occur, hazardous wastes could pollute the environment, contaminate drinking water supplies, contaminate the ground water, and enter the food chain. Among these are arsenic, mercury, lead, chromium and cyanide. These wastes are generated by an entire spectrum of industry.
"9. Landfilling is the least desirable means of hazardous waste disposal. Many hazardous wastes remain in the environment and do not break down. Although some wastes degrade or can be made less hazardous through treatment, many substances remain hazardous forever.
"10. Although hazardous wastes are now required to be solidified before being placed in a landfill, seepage of groundwater and surface water into closed trenches at Emelle containing liquid or solidified wastes creates a poisonous liquid known as leachate. Scientists are continuing to learn more about leachate and water pressures. As concluded in the August, 1983 report to CWM by Golder Associates, the accumulation of leachate in closed trenches will result in a `vertical head difference serv[ing] as the driving force which will eventually *1374 cause exfiltration of fluid within the landfill trenches outward into the surrounding chalk.' The testimony at trial was that it appears that leakage has already occurred with respect to at least some of the closed trenches. Leachate is presently pumped only from closed Trench 19 and open Trench 21. It is stored in above ground storage tanks with a capacity of 5 million gallons. From 10 million to 15 million gallons annually of leachate and surface water are gathered, stored and transported from Emelle at a cost of $2 to $3 million.
"11. EPA has found that absolute prevention of migration of hazardous waste through synthetic trench liners is beyond the current technical state of the art, and that some migration will occur. The liners will probably retard migration only for the relatively short-term measured in tens of years. Although it appears that leachate is already seeping into the Selma chalk, it is uncertain how far it has moved and at what rate it will travel. There are widely varying estimates as to travel time. A November, 1987 joint report of the hazardous waste Ground-Water Task Force of EPA and the Alabama Department of Environmental Management (`ADEM') entitled `Evaluation of Chemical Waste Management, Inc., Emelle, Alabama', stated at page 30 as follows:
"`The transit time through the Selma chalk ("to the Eutaw Formation ... uppermost aquifer") was estimated by CWM to be 10,000 years. Independent EPA estimates of transit time using conservative estimate for equation variable were 330 years and 3,000 years for estimates using Darcy's Equation and a 2-D solute transport model, respectively....'
"Those transit time estimates all involve complicated calculations based upon highly variable factors.
"12. The evidence shows that possibly a more serious concern is the lateral migration of leachate from the trenches following the downward gradient to the drainage areas leading to Bodka Creek, a tributary of the nearby Noxubee and Tombigbee Rivers. Although the closed trenches studied by Golder Associates in an August, 1990 report range from 50 to 150 feet apart, a CWM expert witness testified it would surprise him if there were a migration of fluid from some of the closed trenches to other closed trenches; that there probably is some interconnection between those trench walls; and that fluid could move along the near surface defects in the downgradient direction.
"13. The Selma Group Chalk Formation, in which the Emelle facility is located, extends across the states of Alabama, Mississippi, Arkansas and Texas. Although the chalk generally is of low permeability and is potentially suitable for the geological containment of hazardous wastes, the geologic integrity of the chalk also depends on the permeability of fractures, faults and other discontinuities. Faults and fractures exist throughout the Selma chalk at Emelle through which the leakage of hazardous waste and leachate may be greatly facilitated. Dr. Richard Groshong, a geology professor at the University of Alabama, testified that the faults and fractures may accelerate travel time through the Selma chalk by several orders of magnitude. According to Dr. Groshong, these rates `are important on a human time scale as opposed to a geological time scale.' Tom Joiner, a former State Geologist, agreed that a `brittle fault' might speed the migration of leachate through the Selma chalk.
"14. Dr. Groshong testified that there is a further need to identify, map, and study the faults and fractures at the Emelle facility. However, there will always be uncertainty with respect to the faults and fractures.
"15. To monitor leachate and hazardous waste leakage, CWM has been required to install a large number of monitoring wells at Emelle. Periodic checks of those monitoring wells will be required forever. One CWM witness estimated the present annual costs of that monitoring system is between $100,000 *1375 and $200,000. Another CWM official estimated monitoring costs of Emelle to be in excess of $1½ million per year. It is doubtful that monitoring wells can be placed in sufficient locations to monitor all the movement of water as such monitoring may prove to be impractical. Thus, the uncertainty of whether all contamination will be detected will likely remain. Indeed, the existence of monitoring wells creates new conduits for hazardous wastes to reach underlying groundwater.
"16. The Emelle facility is within an earthquake risk zone as designated by the Alabama Emergency Management Agency. There was testimony to the effect that earthquakes pose an uncertain short and long range risk to the Emelle facility. In 1886 an earthquake in Sumter County caused a one-half foot movement in the ground surface. There was evidence that, depending upon its severity, an earthquake could unseal cracks in the chalks and open avenues for the movement of leachate and hazardous wastes.
"D. Transportation and Spills

"17. In 1989, approximately 40,000 truckloads of wastes were transported over the public highways to the Emelle facility of which approximately 34,000 to 36,000 were from out of state. As in the operation of the facility, transportation of these wastes, no matter how elaborate the precautions, also creates unquantifiable risk or uncertainty to the public health and to the environment.
"Some trucks destined for Emelle have been involved in accidents causing hazardous waste to be spilled or released into the environment. Additionally, several incidents of releases of hazardous wastes and noxious fumes have already occurred at the facility. These risks are increased by the increasing volumes. The hazardous wastes landfilled at the Emelle facility are inherently dangerous in their transportation and movement into or from one place to another throughout the State of Alabama. That movement into and through the State of Alabama carries the potential and risk of spills, accidents and explosions that could release toxic fumes and contaminate the groundwater and/or surface water. The increasing volumes have increased the risks and liability involved in that transportation.
"E. Permanence of Dangers and Financial Risks

"18. Although it will be necessary to monitor, regulate, maintain (including the pumping, collection, storage, transportation and disposal of leachate from the trenches), and secure the facility forever, CWM has made no provision for the payment of such costs beyond a period of 30 years after closure. Additionally, there has been no provision for the payment of any abatement, corrective, or remediation costs, compliance monitoring, third-party damages or natural resource damage.
"19. Whenever CWM's planned or unplanned cessation of activities at Emelle occurs, there will be substantial financial and environmental risks to the people, businesses, and corporations of Alabama.
"20. Alabama has a legitimate interest in guarding against the various imperfectly understood environmental risks posed by the storage of large quantities of hazardous wastes in Alabama, as well as the risks which may be more easily identified.
"F. The Legislative Classifications

"21. The CWM hazardous waste facility at Emelle currently is the only commercial hazardous waste landfill in Alabama. Of the 788,000 tons of waste landfilled at Emelle during 1989, 68,000 to 69,000 tons were generated in-state, or 8.6% of the 1989 total.
"22. There is only one, relatively small non-commercial hazardous waste landfill facility presently permitted for hazardous waste in Alabama. It is in Washington County, and it accepts only on-site generated hazardous waste of approximately 4000 tons a year.

*1376 "23. Closed non-commercial hazardous waste landfills (such as Sanders Lead in Troy) are not comparable to Emelle. They only accepted on-site generated hazardous waste and are no longer in operation.
"24. Non-commercial hazardous waste facilities are not comparable to commercial hazardous waste facilities. Commercial facilities are likely to involve the transportation of wastes from offsite locations, and the accumulation and disposal of relatively large quantities of hazardous wastes; most non-commercial facilities dispose of wastes on-site, and generally do not involve transportation. The amounts generated and disposed of at non-commercial facilities are far smaller than amounts disposed of at commercial facilities. Accordingly, the public health and safety risks associated with commercial hazardous waste facilities are much greater than those associated with non-commercial facilities.
"25. Incinerators are not comparable to commercial hazardous waste landfills. Incinerators permanently destroy hazardous waste, leaving only a small residue which must be landfilled.
"26. Should additional commercial hazardous waste landfills be permitted in Alabama, and meet the statutory criteria, the provisions of Act 90-326 would apply to them just as they apply now to CWM."

I.
We first consider whether the trial court erred in holding that the Base Fee of Act No. 90-326 is constitutional. CWM contends the trial court erred in finding the Base Fee constitutional and argues that it clearly discriminates against interstate commerce in violation of the Commerce Clause. CWM argues further that the Base Fee violates the Equal Protection Clause, because, it claims, the classifications are not rationally related to a legitimate state interest. CWM finally argues that the Base Fee violates the Due Process Clause.
We do not find CWM's arguments as to this issue to be persuasive. We adopt the conclusions of law stated by Judge Phelps in his order of February 28, 1991, as the decision of this Court as to this issue:

"The Base Fee

"(1) The Commerce Clause Challenge

"As a threshold matter, the Court concludes that the Base Fee regulates evenhandedly and without regard to origin. The Base Fee effectuates a legitimate local interest. The legislature found, among other things, that: the volume of hazardous wastes being disposed of in Alabama has increased dramatically; the state incurs a permanent risk to the health of its people and the maintenance of its natural resources; and Alabama incurs substantial economic costs related to hazardous waste management such as regulatory costs and spill cleanup. Additionally, the evidence at trial documented specific possible threats to human health and the environment posed by the Emelle facility. Clearly, the state of Alabama has a legitimate interest in imposing fees on commercial hazardous waste facilities to address the serious financial, environmental and other risks they create.
"It is well-settled that states' regulatory powers are greatest when they address traditional matters of local concern such as environmental and natural resource regulation. Kassel v. Consolidated Freightways, 450 U.S. 662, 670, 101 S.Ct. 1309, 67 L.Ed.2d 580, 586 (1981). Legislative measures enacted to promote public health and safety are accorded particular deference. Raymond Motor Transportation, Inc. v. Rise, 434 U.S. 429, 443, 98 S.Ct. 787, 54 L.Ed.2d 664, 676 (1978). Challenges to state public safety regulations must overcome a `strong presumption of their validity.' Id., 434 U.S. at 444, 98 S.Ct. at 795, 54 L.Ed.2d at 677. Courts will not secondguess legislative judgments about the importance of safety justifications in comparison with the burdens on interstate commerce. Kassel, 450 U.S. at 670 [101 S.Ct. at 1316], 67 L.Ed.2d at 587. States retain broad authority under their general police powers to regulate matters *1377 of legitimate local concern even though interstate commerce is affected. Maine v. Taylor, 477 U.S. 131, 138 [106 S.Ct. 2440, 2447, 91 L.Ed.2d 110] (1986).
"When a police power regulation is challenged under the Commerce Clause, one of two tests is applied. If the regulation is discriminatory on its face or in practical effect, the state must show that (1) the regulation has a legitimate local purpose; (2) the regulation serves this interest; and (3) reasonable nondiscriminatory alternatives, adequate to preserve the legitimate local purpose, are not available. Hughes v. Oklahoma, 441 U.S. 322, 336 [99 S.Ct. 1727, 1736, 60 L.Ed.2d 250] (1979). This is the `strict scrutiny' test.
"If no facial discrimination is involved, a `balancing test' is applied to determine the constitutional validity of statutes:
"`Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.'

Pike v. Bruce Church, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). If a legitimate local purpose exists, `the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.' Id.

"CWM has failed to establish that the Base Fee has discriminatory effects on interstate commerce. The mere fact, as CWM argues, that most of its customers are out-of-state generators does not establish discrimination against interstate commerce. The United States Supreme Court has stated that even if the burden of a state regulation falls most often on out-of-state companies, this burden `does not, by itself, establish a claim of discrimination against interstate commerce.' CTS Corp. v. Dynamics Corp. of America, 481 U.S. 69 [107 S.Ct. 1637, 95 L.Ed.2d 67] (1987); see also Commonwealth Edison Co. v. Montana, 453 U.S. 609 [101 S.Ct. 2946, 69 L.Ed.2d 884] (1981); Exxon Corp. v. Gov. of Maryland, 437 U.S. 117, 126 [98 S.Ct. 2207, 2214, 57 L.Ed.2d 91] (1978). The strict scrutiny test does not apply in these circumstances.[2]
"The Base Fee does not facially discriminate against out-of-state waste. All waste disposed of at Alabama commercial hazardous waste facilities is subject to the $25.60 fee. Consequently the Pike v. Bruce Church balancing test will be applied to assess the fee's constitutional validity. In balancing the interests at stake, the Court finds that the burden the Base Fee imposes on interstate commerce is not clearly excessive in relation to the benefits it produces. The fee benefits the state, on the other hand, by compensating it for the financial responsibilities and risks it bears on account of commercial hazardous waste disposal activities. Thus, a comparison of the Base Fee's local benefits to its alleged burden on interstate commerce establishes that any such burden is not clearly excessive. Furthermore, to the extent that the Base Fee does deter hazardous waste landfilling, the fee is a proper instrument of deterrence.[3] Finally, in view of the financial, safety, environmental and other objectives of Act No. 90-326 and the fact that the Base Fee falls evenhandedly on interstate and intrastate waste, it is difficult *1378 to imagine how these objectives could be accomplished in ways that have a lesser impact on interstate activities.
"For these reasons, CWM's Commerce Clause challenge to the Base Fee is without merit.
"(2) The Equal Protection Challenge

"The Equal Protection Clause of the United States Constitution and similar provisions of the Alabama Constitution prohibit the State of Alabama from denying any person equal protection of the law. There is a `presumption of constitutionality which can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes.' Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364-65 [93 S.Ct. 1001, 1006, 35 L.Ed.2d 351] (1973). See also White v. Reynolds Metals Co., 558 So.2d 373 (Ala.1989). `The burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.' Madden v. Kentucky, 309 U.S. 83, 88 [60 S.Ct. 406, 408, 84 L.Ed. 590] (1940). Unless the state statute involves a suspect class or a fundamental right, courts generally will not overturn the statute on equal protection grounds `unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [the court] can only conclude that the legislature's actions were irrationsl.' Pennell v. San Jose, 485 U.S. 1, 14 [108 S.Ct. 849, 859, 99 L.Ed.2d 1] (1988) (quoting Vance v. Bradley, 440 U.S. 93, 97 [99 S.Ct. 939, 942, 59 L.Ed.2d 171] (1979)). The statute must be `rationally related to a legitimate state interest' Bankers Life & Casualty Co. v. Crenshaw, 486 U.S. 71, 81, 108 S.Ct. 1645, 100 L.Ed.2d 62, 74 (1988) (quoting Cleburne v. Cleburne Living Center, 473 U.S. 432, 440 [105 S.Ct. 3249, 3254, 87 L.Ed.2d 313] (1985)). If the state legislature's determination that its regulation will serve a legitimate public purpose is `at least debatable,' the challenge to that action must fail. United States v. Carolene Products Co., 304 U.S. 144, 154 [58 S.Ct. 778, 784, 82 L.Ed. 1234] (1938). `[C]ourts are not empowered to second-guess the wisdom of state policies.' Western & Southern Life Ins. Co. v. Board of Equalization, 451 U.S. 648, 670 [101 S.Ct. 2070, 2084, 68 L.Ed.2d 514] (1981). This `rational relationship' test is not difficult to pass. Metropolitan Life Ins. Co. v. Ward, 470 U.S. 869, 881 [105 S.Ct. 1676, 1683, 84 L.Ed.2d 751] (1985). Additionally, state regulations dealing with health, welfare and the economy are entitled to deferential Equal Protection review. Evergreen Waste Systems, Inc. v. Metropolitan Service District, 643 F.Supp. 127, 133 (D.Or. 1986) (citing Hughes v. Alexandria Scrap Corp., 426 U.S. 794 [96 S.Ct. 2488, 49 L.Ed.2d 220] (1976)); Railway Express Agency v. New York, 336 U.S. 106 [69 S.Ct. 463, 93 L.Ed. 533] (1949)). State tax legislation is given great deference. White v. Reynolds Metals Co., 558 So.2d at 380. States are free to impose taxes on different trades and professions, and may vary the tax rates on different products. Id. (quoting Allied Stores of Ohio, Inc. v. Bowers, 358 U.S. 522, 526-27 [79 S.Ct. 437, 440-41, 3 L.Ed.2d 480] (1959)). Because the Base Fee provision involves neither a suspect class, such as race, nor a fundamental right, such as free speech, this Court must analyze the statute under the above-described, lenient `rational relationship' test, see Exxon Corp. v. Eagerton, 462 U.S. 176, 195-96 [103 S.Ct. 2296, 2308, 76 L.Ed.2d 497] (1983), asking 1) whether the provisions have a legitimate purpose, and 2) whether it was `reasonable for the lawmakers to believe that use of the challenged classification would promote that purpose....' Western & Southern Life Ins. Co., 451 U.S. at 668 [101 S.Ct. at 2083].
"CWM argues that the Base Fee deprives it of equal protection of the law because it only applies to commercial hazardous waste facilities, and its Emelle operations constitute the only such facility in Alabama. The Court does not *1379 agree with this contention. First, the Court does not agree with the implication that CWM has somehow been `singled out' because the Base Fee, as a practical matter, only applies to it. There is no evidence to suggest that Act No. 90-326 will not apply to commercial hazardous waste facilities which are sited in Alabama in the future. Until that time, any regulation of commercial hazardous waste facilities will necessarily fall on CWM alone. This fact, however, does not prevent the legislature from regulating CWM's operations.[4]
"Second, the Court finds that the legislature's treatment of commercial hazardous waste facilities differently from noncommercial facilities is rationally related to legitimate state interests. The evidence at trial established several reasons for the differentiation. For example, the use of commercial disposal sites poses unique health and safety risks, such as the transportation of dangerous materials to the sites with the risk of accidents involving such transportation, and the accumulation in one place of extremely large volumes of different types of waste. The number of trucks delivering hazardous waste to the Emelle facility alone was approximately 40,000 during 1989, and was expected to increase in subsequent years. Hazardous waste disposal at non-commercial facilities, however, does not involve transportation of the materials to be disposed of, with the dangers inherent in and unique to such transportation. Such facilities dispose of their waste on-site. In CECOS International, Inc. v. Jorling, 895 F.2d 66 (2d Cir.1990), the plaintiffs argued that a state law requiring siting board approval for the expansion of commercial, but not non-commercial, hazardous waste facilities violated equal protection. The Second Circuit rejected this argument because the state provided several reasons for applying this requirement to commercial facilities. The reasons included the fact `that there are greater risks associated with commercial facilities because hazardous wastes must be transported to the off-site commercial facility.' Id. at 73 (emphasis supplied). The State of Alabama has offered similar reasons for the classification now before the Court.
"Moreover, commercial landfill facilities comprise the bulk of the hazardous waste accumulation problem. The waste disposed of at commercial facilities exceeds many times the waste disposed of on site by non-commercial facilities. Additionally, without regard to the health, safety and environmental concerns, and viewing the fees simply as taxes, the legislature is not precluded from taxing a commercial transaction simply because it does not impose the tax on a similar noncommercial activity. Many constitutionally permissible tax measures treat different taxable entities in different ways.
"Thus, CWM has failed to meet its burden of negating every conceivable basis which might support Act No. 90-326's differing treatment of commercial and non-commercial facilities. White v. Reynolds Metals Co., supra. The differentiation serves a legitimate purpose and it was reasonable for the legislature to believe that the classification promotes that purpose. This Court, therefore, must defer to the legislature's classification of these two types of facilities.
"(3) The Due Process Challenge

"Article I, section 6 of the Alabama Constitution states, among other things, that no accused in a criminal prosecution shall be deprived of life, liberty, or property except by due process of law. This right has been extended to civil trials. Ross Neely Express, Inc. v. Alabama Dep't of Environmental Management, 437 So.2d 82, 84 (Ala.1983). In order to avoid violating the Due Process Clause of the Alabama Constitution, a legislative *1380 classification must be reasonable and not arbitrary. White v. Associated Industries of Alabama, Inc., 373 So.2d 616, 617 (Ala.1979).
"The Base Fee is reasonable in function. It provides some financial assurance against the risks associated with materials posing a permanent threat to health, safety and the environment. The burden imposed is not an excessively heavy one. While CWM's right to maximize profits is certainly important, it does not by any stretch of the imagination outweigh the state's interest in protecting the health and safety of its citizens and environment. Under any kind of `rational and reasonable' analysis, therefore, the Base Fee is clearly valid.

II.
Next we must consider whether the trial court erred in holding that the Cap provision of Act No. 90-326 is constitutional and is not preempted by federal statutes.[5] We find the reasoning and the conclusions of law by the trial judge to be persuasive on this issue. We therefore adopt Judge Phelps's order of February 28, 1991, as to the issue of the Cap provision, as the decision of this Court:

"THE CAP PROVISION

"(1) The Commerce Clause Challenge

"The Court now turns to the question of whether the `Cap' provision violates the Commerce Clause. This provision states that no commercial hazardous waste disposal facility which takes in more than 100,000 tons of hazardous waste annually may dispose of more waste in the year starting October 1, 1991 than it disposed of during the statutory benchmark period, regardless of the origin of the waste. The position of CWM would allow it, and not the Alabama legislature, to determine what volume of hazardous waste will be buried permanently in the state. CWM insists that the Cap provision, like the fees, is an impermissible legislative interference with its rights to dispose of and to bury in Alabama whatever volume of such waste that it wishes. This Court disagrees, and concludes that the Cap provision is no more violative of the Commerce Clause than the Base Fee, and for many of the same reasons.
"The Cap provision applies equally to in-state and out-of-state waste. Accordingly, the Pike v. Bruce Church balancing test must be utilized to assess its validity under the Commerce Clause. Like the Base Fee, the Court finds that the Cap provision regulates evenhandedly to effectuate a legitimate local interest. Tonnage restrictions which apply equally to all waste, regardless of origin, do not violate the Commerce Clause. Wetzel County Solid Waste Authority v. West Va. Div. of Natural Resources, 401 S.E.2d 227 (W.Va.1990). The state has a clear and legitimate interest in conserving its natural resourcesthe Selma chalk and the Eutaw aquiferand in protecting the health and safety of its citizens. The state also has a legitimate interest in protecting the environment surrounding the Selma chalk and the Eutaw aquifer and in extending the life of the landfill for the benefit of in-state and out-of-state waste generators. The Cap provision promotes this interest without discrimination by limiting the amount of waste that can be disposed of at Emelle during any 12-month period. See County of Washington v. Casella Waste Management, Inc., 1990 WL 208709 (N.D.N.Y. Dec. 6, 1990) (stating that local law prohibiting all out-of-county solid waste served a legitimate local purpose in protecting public health and safety as well as the environment, and noting that one of the legitimate effects of the local law might be to extend the useful life of *1381 safe landfills); and Bill Kettlewell Excavating, Inc. v. Michigan Dept. of Natural Resources, 732 F.Supp. 761 (E.D.Mich.1990) (holding that statute requiring county approval for disposal of out-of-county solid waste served legitimate purpose of extending lives of the county's landfills). The Cap provision also furthers Alabama's legitimate interest in controlling health and safety risks by, in effect, regulating the amount of waste being transported on the state's highways and to its landfills. The Court again notes that landfilling is the least desirable form of waste disposal as it poses a perpetual threat to the ground and surface waters in the landfill's vicinity and to the surrounding environment. The Cap provision necessarily encourages the development of new technologies to supplement and minimize hazardous waste landfilling.
"Finally, any burden which the Cap provision might place on interstate commerce is speculative. The Cap limits the amount of waste in successive years only to that amount landfilled during the 1990-91 benchmark period.... Thus, the Cap creates no discriminatory burden on existing levels of commerce or on existing rates of waste generation and landfilling. The Cap provision permits increased volumes if such is warranted in accord with safety or to comply with State or federal regulations.[6] Thus, the Cap provision merely furthers the policy that future growth in the amounts of such waste to be disposed of must be accompanied by growth in the development and use of safer and more environmentally sound methods of disposal. (See § 9 of Act 90-326).
"(2) The Supremacy Clause Challenge

"CWM alleges that the Cap provision comes into conflict with three federal statutes: The Resource Conservation and Recovery Act (`RCRA'), 42 U.S.C.A. § 6901 et seq., which governs treatment and disposal of solid waste, the Toxic Substances Control Act (`TSCA'), 15 U.S.C.A. § 2602 et seq., which regulates the disposal of toxic wastes such as PCBs, and the Comprehensive Environmental Response, Compensation, and Liability Act (`CERCLA'), 42 U.S.C.A. § 9601 et seq., which provides federal funding for cleanup of hazardous and toxic substances. CWM's Emelle facility operates under permits issued in accordance with these federal statutes, and CWM argues that the Cap provision directly conflicts with either the provisions or the goals of all three. The Court disagrees, and will treat each statute in turn.
"(a) The Cap Provision Does Not Conflict With, Frustrate, or Impede the Operation of RCRA.

"RCRA, as amended in 1983, is a `cradle to grave' regulatory program which sets standards for the generation, treatment, storage, and disposal of hazardous waste. RCRA is designed to promote several goals with regard to hazardous waste: 1) assuring that hazardous waste management is conducted in a way that protects human health and the environment; 2) requiring that hazardous waste be properly managed from the outside; and 3) minimizing the generation of hazardous waste and the landfilling of hazardous waste by encouraging process substitution, materials recovery, recycling, and treatment. 42 U.S.C.A. § 6902(b).

*1382 "RCRA demonstrates a strong policy against landfilling. In the congressional findings accompanying the 1983 amendments, Congress found that `reliance on land disposal should be minimized or eliminated, and land disposal, particularly landfill and surface impoundment, should be the least-favored method for managing hazardous wastes....' 42 U.S.C.A. § 6901(b)(7). Congress also maintained that alternatives to land disposal `must be developed.' Id. at § 6901(b)(8). The floor debates which preceded the passage of the amendments repeatedly emphasized concerns about the dangers of landfill disposal. Congresswoman Schneider stated that the bill required a `direct economic disincentive for the land disposal of hazardous waste,' and advocated supplementing the measure with `economic incentives that encourage alternatives to land disposal.' 29 CONG.REC. pt. 17 (1983), p. 23164. Congressman Walgren argued,
"`In my view, our society should seriously question the continued land disposal of hazardous wastes. If we can find ways to dispose or neutralize hazardous waste instead of dumping it in the ground, we should. Ground disposal is inherently dangerous because subsequent contamination of liners in landfills can be penetrated with underground water. There are other ways to dispose of wastes that we should turn to....'

Id. at p. 23163. Congressman Frenzel similarly stated, `continued reliance on land disposal of hazardous wastes is a dangerous policy which threatens the health of Americans now and in the future.' Id. at p. 23161.
"In light of these concerns, this Court finds that the Cap provision is consistent with what the Congress had in mind when passing RCRAreducing the amount of landfilled wasteand furthers, rather than frustrates the purpose of RCRA. The Cap provision is a mechanism which will encourage generators to find ways other than landfilling to dispose of their hazardous wastes, and this is exactly what Congress emphasized in RCRA.
"Further, RCRA directly addresses the question of federal/state supremacy. Section 6929 states that no state may impose treatment and disposal requirements less stringent than those prescribed in RCRA, and further states, `Nothing in this chapter shall be construed to prohibit any state ... from imposing any requirements, including those for site selection, which are more stringent than those imposed by such regulations.' RCRA sets a floor, a minimum level of regulation by which all states must abide. State actions or regulations which go above that floorwhich are more stringent than RCRAare expressly permitted. The Cap provision, being more stringent than the requirements of RCRA, is clearly permissible. In short, there is no indication that the Cap provision conflicts with or impedes the operation of RCRA in any way.
"(b) The Cap Provision Does Not Conflict With, Frustrate, or Impede the Operation of TSCA.

"TSCA regulates the handling of toxic chemical substances and mixtures in an attempt to promote the promulgation of adequate data concerning the risks involved with such substances. In particular, Congress wishes through TSCA to encourage technological innovation, while at the same time ensuring that such innovation did not `present an unreasonable risk of injury to health or the environment' 15 U.S.C.A. § 2601(b)(3). Again, in light of this policy, the Court finds that the Cap provision, one effect of which will be to encourage the development of alternative disposal technologies while minimizing the amount of waste landfilled, does not `stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting TSCA,' as CWM claims. In light of express congressional policy discouraging and disfavoring the practice of burying such highly dangerous materials in the ground, the Court cannot conceive that Congress, in enacting TSCA, intended to grant landfill operators *1383 a right to bury unlimited amounts of such materials. Nor does the Court find that such unlimited burial is necessary to the implementation of that Act.
"(c) The Cap Provision Does Not Conflict With, Frustrate, or Impede the Operation of CERCLA.

"`[T]he primary purpose of CERCLA is the prompt cleanup of hazardous waste sites.' State of Alabama v. United States Environmental Protection Agency, 871 F.2d [1548] at 1557-58 [11th Cir.1989] (quoting Dickerson v. Administrator, EPA, 834 F.2d 974, 978 (11th Cir.1987)). CERCLA allows the Administrator to promulgate regulations involving substances which, when released, could cause harm to the environment. 42 U.S.C.A. § 9602(a). It requires anyone who has knowledge of the release of such a substance greater than a designated amount to notify the United States government. 42 U.S.C.A. § 9603. Whenever such a release occurs, CERCLA authorizes the President to remove the substance and/or provide for remedial action, or to take any other response `consistent with the national contingency plan.' 42 U.S.C.A. § 9604(a). Along with 26 U.S.C.A. § 9507, CERCLA establishes a trust fund, commonly known as `Superfund,' to be used to pay costs incurred by the government in providing this help. 42 U.S.C.A. § 9611.
"CWM argues that the Fee Act's Cap provision artificially requires the Emelle facility to withhold capacity that otherwise would be available immediately for the disposal of waste generated at Superfund cleanup sites located outside of the State of Alabama, and that the provision `undermines Congress's goal of making the best use of existing waste treatment and disposal facilities in the short term.' CWM's argument is based on the assumption that Alabama has the burden under CERCLA of meeting the capacity assurance requirements of other states. This Court does not agree. CERCLA places the capacity assurance burden on the state generating the waste, not on the state importing it. Alabama is not required to provide enough capacity to dispose of all of the waste generated in the United States during the next twenty years; it has to assure the President only that it can provide capacity to dispose of its own waste during that period.
"Again, CWM is arguing that a statute designed to protect and promote health, safety and environmental quality indirectly evidences a congressional policy which directly conflicts with the express congressional policy against landfilling. CWM would have the Court construe CERCLA as being inconsistent with the policy clearly stated in another congressional enactment addressing the same general environmental quality concerns. This Court cannot find that Congress, in providing for clean-up of the results of past unsound waste disposal practices, intended to imply a policy conflicting with its expressly stated condemnation of reliance on landfilling.
"(3) The Due Process Challenge

"Economic and social legislation, such as that involved herein, falls under the substantive component of the Due Process Clause, and the standard for evaluating its validity is virtually identical to the Equal Protection `rational relationship' test. In re Wood, 866 F.2d 1367, 1371 (11th Cir.1989).
"`[Economic and social legislation] generally will be upheld against a substantive due process attack unless the legislation "manifests a patently arbitrary classification, utterly lacking in rational justification." Fleming v. Nestor, 363 U.S. 603, 611 [80 S.Ct. 1367, 1372, 4 L.Ed.2d 1435] ... (1960). As with the "rational relationship" test, any plausible reason supporting Congress' action in enacting the suspect legislation satisfies the "rational basis" test. Id. at 612, 80 S.Ct. at 1373.'

Id. (emphasis in the original). This Court's analysis of CWM's Due Process challenge to the Cap provision, therefore, is very similar to its analysis of CWM's Equal Protection claims.

*1384 "CWM contends that the Cap provision `arbitrarily and irrationally' deprives it of its property interest in the Emelle facility in violation of the Due Process Clause. However, where, as here, restrictions on waste disposal are related to the state's goal of preserving and managing landfill space and in protecting the health and safety of its citizens, such restrictions do not violate due process. Bill Kettlewell Excavating, Inc. v. Michigan Dept. of Natural Resources, 732 F.Supp. 761, 765 (E.D.Mich.1990). Moreover, the state's reasons for treating hazardous waste buried in commercial facilities differently from industrial waste buried on site are rational and are not arbitrary. The Cap provision is rationally related to reducing the transportation and accumulation of hazardous waste and similar dangerous substances in the state. When such a rational basis for a statute exists, it does not violate the Due Process Clause.
"(4) The Contracts Clause Challenge

"Article I, section 10 of the federal Constitution makes it unlawful for states to impair the obligations of contracts. Although debtor relief laws were the primary focus of the Contracts Clause, Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. 470, 502-503 [107 S.Ct. 1232, 1251, 94 L.Ed.2d 472] (1987), the Clause has since been applied to other kinds of laws, including state laws that have the incidental effect of altering contractual obligations. See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234 [98 S.Ct. 2716, 57 L.Ed.2d 727] (1978). A state statute does not violate the Contracts Clause `simply because it has the effect of restricting, or even barring altogether, the performance of duties created by contracts entered into prior to its enactment.' Exxon Corp. v. Eagerton, 462 U.S. at 190 [103 S.Ct. at 2305]. Rather, a court analyzing a Contracts Clause claim must employ a balancing test.
"First, the court must determine whether the state law has in fact substantially impaired the contractual relationship. Spannaus, 438 U.S. at 244 [98 S.Ct. at 2722].
"`The severity of the impairment measures the height of the hurdle the state legislation must clear. Minimal alteration of contractual obligations may end the inquiry at its first stage. Severe impairment, on the other hand, will push the inquiry to a careful examination of the nature and purpose of the state legislation.'

Id. at 245 [98 S.Ct. at 2723]. Second, if the law does substantially impair the contractual rights, the state must show that the law was designed to promote a legitimate public purpose, such as remedying a general social or economic problem. Energy Reserves Group v. Kansas Power and Light Co., 459 U.S. 400, 411-412 [103 S.Ct. 697, 704-05, 74 L.Ed.2d 569] (1983). Finally, if the statute is shown to have a legitimate public purpose, the state must show that the law is based on reasonable conditions and that it is of a character appropriate to the public purpose. Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 445-47 [54 S.Ct. 231, 242-43, 78 L.Ed. 413] (1934). In making this determination, courts defer to the legislative judgment if the regulation involved is social or economic. United States Trust Co. v. New Jersey, 431 U.S. 1, 22-23 [97 S.Ct. 1505, 1517-18, 52 L.Ed.2d 92] (1977).
"Applying the above analysis, the conclusion is clear that the Cap provision does not violate the Contracts Clause. First, CWM has made no showing that the Cap provision has impaired its existing contracts. Second, even had CWM presented some proof that the Cap provision impaired its existing contracts, it is clear that the law was designed to promote a legitimate public purpose. Finally, as discussed above, the Cap provision is based on reasonable conditions: it allows CWM and the out-of-state generators to determine the cap amount. Moreover, it is of a character to promote the public purposeit will prevent the amount of hazardous waste buried in the state from increasing in subsequent *1385 years. All three elements of the test balance in favor of the Cap provision.
"(5) The Takings Clause Challenge

"Under the Fifth Amendment to the United States Constitution, government is prohibited from taking private property for public use without just compensation. The question to be answered in determining whether the Takings Clause has been violated is whether the governmental action amounts to a `taking' requiring compensation. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 413 [43 S.Ct. 158, 159, 67 L.Ed. 322] (1922). To make this determination, a court must determine 1) whether there is a property interest involved, see, e.g., Andrus v. Allard, 44 [444] U.S. 51, 65-66 [100 S.Ct. 318, 326-27, 62 L.Ed.2d 210] (1979); and 2) whether that property interest has been diminishedin a case like the present one, whether there has been a diminution in the economic viability of the property by the state regulation, see Keystone Bituminous Coal Ass'n v. DeBenedictis, 480 U.S. at 485-86 [107 S.Ct. at 1242], or whether state infringement of the private property right was done in the legitimate exercise of Police Power or to advance a legitimate state interest and whether the infringement operates to further that interest, see id.; Agins v. City of Tiburon, 447 U.S. 255, 260 [100 S.Ct. 2138, 2141, 65 L.Ed.2d 106] (1980). If the result of this analysis indicates that there has in fact been a taking, the remedy is generally payment of just compensation. See Nollan v. California Coastal Comm'n, 483 U.S. 825, 841-42 [107 S.Ct. 3141, 3151, 97 L.Ed.2d 677] (1987).
"The Cap provision has not effected a `taking' within the meaning of the Takings Clause. This Court has already established several times over the fact that the Cap provisionindeed, the Fee Act as a wholeadvances legitimate state interests. It is equally clear that the Cap provision has not made it commercially impracticable for CWM to continue operating its Emelle facility. CWM still owns the Emelle facility in its entirety. Its use has not been changed or restricted; it is still a commercial hazardous waste disposal facility. Comparing, then, `the value that has been taken from the property with the value that remains in the property,' DeBenedictis, 480 U.S. at 497 [107 S.Ct. at 1248], the Court concludes that even if some diminution in value has occurred, it by no means would constitute a taking requiring compensation under the Takings Clause."

III.
We next consider whether Act No. 90-326 is a "revenue bill" enacted in violation of Article IV, § 70, of the Alabama Constitution. We again adopt the trial court's order as the decision of this Court as to this issue:

"The Challenge Under § 70 of the Alabama Constitution
"The Court finds that enactment of the Fee Act did not violate Article IV, Section 70 of the Alabama Constitution. Article IV, section 70 of the Alabama Constitution provides:
"`All bills for raising revenue shall originate in the house of representatives. The governor, auditor, and attorney general shall, before each regular session of the legislature, prepare a general revenue bill to be submitted to the legislature, for its information, and the secretary of state shall have printed for the use of the legislature a sufficient number of copies of the bill so prepared, which the governor shall transmit to the house of representatives as soon as organized, to be used or dealt with as that house may elect. The senate may propose amendments to revenue bills. No revenue bill shall be passed during the last five days of the session.'
CWM asserts that the Fee Act is a revenue bill which was enacted during the last five days of the legislative session, and that the enactment thus violated the last sentence of Article IV, section 70.
"This Court finds that the Fee Act is not a `revenue bill' within the meaning of *1386 section 70. In Woco Pep Co. of Montgomery v. Butler, 225 Ala. 256, 142 So. 509 (1932), the Alabama Supreme Court explained the meaning of the term `revenue bill' as it appears in the last sentence of section 70. The Constitution of 1875 contained only the first sentence of the present section 70. When the provision was rewritten for the Constitution of 1901, the last three sentences were added, defining a `general revenue bill' and explaining how such a bill was to be enacted. The Supreme Court considered the added sentences in conjunction with the remarks of the committee chairman who presented the revision to the Constitutional Convention, and came to the conclusion that the last sentence of section 70 `was intended by the Constitution makers to apply only to the general revenue bill' Id. [142 So.] at 511 (emphasis added). The Court held that the fact that the Constitution makers revised the penultimate sentence of section 70 to authorize the Senate to propose amendments to the general revenue bill and to amend specific bills for raising revenue only strengthened its conclusion that the term revenue bill `related exclusively to and affected general revenue bills.' Id. See also Opinion of the Justices, 270 Ala. 38, 115 So.2d 464, 467-68 (1959); Opinion of the Justices, 269 Ala. 676, 115 So.2d 484, 485 (1959); Opinion of the Justices, 259 Ala. 514, 66 So.2d 921, 923 (1953); Dorsky v. Brown, 255 Ala. 238, 51 So.2d 360, 362, cert. denied, 342 U.S. 818, [72 S.Ct. 34, 96 L.Ed. 619] (1951). Because the Fee Act is not a general revenue bill, but a specific measure, section 70 does not apply."

IV.
We next consider whether the trial court erred in holding that the Additional Fee of Act No. 90-326 discriminates against interstate commerce in violation of the Commerce Clause.
The Commerce Clause does not invalidate all state restrictions on commerce. "It has long been recognized that `in the absence of conflicting legislation by Congress, there is a residuum of power in the state to make laws governing matters of local concern which nevertheless in some measure affect interstate commerce or even, to some extent, regulate it.' Southern Pacific Co. v. Arizona, 325 U.S. 761, 767, 65 S.Ct. 1515, 1519, 89 L.Ed. 1915 (1945)." Kassel v. Consolidated Freightways Corp., 450 U.S. 662, 670, 101 S.Ct. 1309, 1316, 67 L.Ed.2d 580, 586 (1981). The constitutionality of a state regulation depends upon "a sensitive consideration of the weight and nature of the state regulatory concern in light of the extent of the burden imposed on the course of interstate commerce." Id., quoting Raymond Motor Transp., Inc. v. Rice, 434 U.S. 429 at 441, 98 S.Ct. 787, at 794, 54 L.Ed.2d 664, at 673 (1978).
In New Energy Co. v. Limbach, 486 U.S. 269, at 278, 108 S.Ct. 1803, at 1810, 100 L.Ed.2d 302 (1988), the United States Supreme Court stated the test in which a facially discriminatory statute may be found to be valid under the Commerce Clause:
"Our cases leave open the possibility that a State may validate a statute that discriminates against interstate commerce by showing that it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. See, e.g., Maine v. Taylor, 477 U.S. at 138, 151, 106 S.Ct., at 2447, 2455; Sporhase v. Nebraska ex rel. Douglas, 458 U.S. [941] at 958 [102 S.Ct. 3456, 3465, 73 L.Ed.2d 1254; (1982) ] Hughes v. Oklahoma, 441 U.S., at 336-337, 99 S.Ct. at 1736; Dean Milk Co. v. Madison, 340 U.S. [349], at 354, 71 S.Ct. [295], at 297 [95 L.Ed. 329 (1951)]. This is perhaps just another way of saying that what may appear to be a `discriminatory' provision in the constitutionally prohibited sensethat is, a protectionist enactmentmay on closer analysis not be so. However it be put, the standards for such justification are high. Cf. Philadelphia v. New Jersey, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978) (`where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity *1387 has been erected'); Hughes v. Oklahoma, 441 U.S., at 337, 99 S.Ct., at 1737 (`[F]acial discrimination by itself may be a fatal defect' and `[a]t a minimum... invokes the strictest scrutiny')."
In holding that the Additional Fee violates the Commerce Clause, the trial judge relied upon City of Philadelphia v. New Jersey, 437 U.S. 617, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1978), and National Solid Wastes Management Ass'n v. Alabama Dep't of Environmental Management, 910 F.2d 713 (11th Cir.1990), modified and reh'g denied, 924 F.2d 1001 (11th Cir.1991), reh'g en banc denied, 932 F.2d 979 (1991); cert. denied, ___ U.S. ___, 111 S.Ct. 2800, 115 L.Ed.2d 973 (1991).
In National Solid Wastes Management Ass'n the 11th Circuit Court of Appeals held the "Holley Bill," Act No. 89-788, Code of Ala.1975, § 22-30-11 (Supp.1990), invalid under the Commerce Clause. The Holley Bill banned disposal of hazardous waste in Alabama from a number of states. The Court of Appeals stated:
"Alabama's selective ban on out-ofstate hazardous waste is no quarantine law. Alabama did not ban hazardous wastes from all other states on the ground that the wastes were dangerous to some human health or environment aspect which Alabama has a right to regulate. Alabama's ban does not distinguish on the basis of type of waste or degree of dangerousness, but on the basis of the state of generation."
Id., 910 F.2d at 721. Unlike the Holley bill, the Additional Fee provision of Act No. 90-326 has specifically been found by the legislature to be an effective way to deal with health and environmental hazards to Alabamians created by hazardous waste imported here from other states. We believe that Alabama has a legitimate local interest which this Act legitimately serves, and is one that is permissible under the Commerce Clause.
The Supreme Court of the United States has not said that hazardous waste is an article of commerce. Assuming that it is an article of commerce, as the 11th Circuit Court of Appeals assumed, we believe that a statute such as the one before us, which advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives, can be valid under the Commerce Clause.
The trial court concluded that City of Philadelphia v. New Jersey, supra, compelled the conclusion that the legislation involved here was foreclosed by the Commerce Clause. We believe that that case is distinguishable under the facts here. That case involved a New Jersey statute that banned the movement of liquid or solid waste (but not hazardous waste) into the state. The purpose of that legislation was found to be economic protectionism, which was in violation of the Commerce Clause. CWM argues that the holding in City of Philadelphia v. New Jersey precludes state and local governments from responding to real and substantial public health and environmental dangers by controlling the importation of wastes. However, the United States Supreme Court cases make a distinction between state measures that discriminate arbitrarily against out-of-state commerce in order to give in-state interests a commercial advantage, i.e., simple economic protectionism, and state measures that seek to protect public health or safety or the environment. Maine v. Taylor, 477 U.S. 131, 148 n. 19, 106 S.Ct. 2440, 2453 n. 19, 91 L.Ed.2d 110 (1986).
In City of Philadelphia v. New Jersey, the Supreme Court made this distinction and decided that the New Jersey statute constituted economic protectionism, rather than a measure to protect the citizens of the state from menaces to their health or safety. City of Philadelphia v. New Jersey does not hold that a state may not limit importation of wastes to protect health and the environment; it holds that a state may not do so for "simple economic protectionism." The Supreme Court has characterized City of Philadelphia v. New Jersey as involving "a state law purporting to promote environmental purposes" but is "in reality `simple economic protectionism.'" Minnesota v. Clover Leaf Creamery Co., *1388 449 U.S. 456, 471, 101 S.Ct. 715, 727, 66 L.Ed.2d 659 (1981).
Mr. Justice Rehnquist, in his dissent in City of Philadelphia v. New Jersey, discussed the growing problem in our nation in the disposal of solid waste and the health and safety hazards associated with its disposal. There, in speaking not of hazardous waste, as in the present case, but of garbage, he noted that the United States Supreme Court has recognized that the States can enact quarantine laws, which "have not been considered forbidden protectionist measures, even though they were directed against out-of-state commerce." Id., 437 U.S. at 631, 98 S.Ct. at 2539 (quoting the majority opinion, 437 U.S. at 628, 98 S.Ct. at 2537). Justice Rehnquist stated:
"The Court recognizes, ante [437 U.S. at 621-624, 98 S.Ct. at 2534-35], that States can prohibit the importation of items, `which, on account of their existing condition, would bring in and spread disease, pestilence, and death, such as rags or other substances infected with the germs of yellow fever or the virus of small-pox, or cattle or meat or other provisions that are diseased or decayed, or otherwise, from their condition and quality, unfit for human use or consumption.'"
437 U.S. at 631, 98 S.Ct. at 2539. (Citations omitted.) Justice Rehnquist considered the quarantine law cases dispositive of the issue, and would have allowed a state to regulate solid wastes from out-of-state.
In Maine v. Taylor, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), the United States Supreme Court made it clear that environmental measures are entitled to greater deference than ordinary legislative acts. The Court upheld a facially discriminatory state statute that banned all importation of live baitfish. The Court stated:
"The Commerce Clause significantly limits the ability of States and localities to regulate or otherwise burden the flow of interstate commerce, but it does not elevate free trade above all other values. As long as a State does not needlessly obstruct interstate trade or attempt to `place itself in a position of economic isolation,' ... it retains broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources. The evidence in this case amply supports the District Court's findings that Maine's ban on the importation of live baitfish serves legitimate local purposes that could not adequately be served by available nondiscriminatory alternatives. This is not a case of arbitrary discrimination against interstate commerce; the record suggests that Maine has legitimate reasons `apart from their origin, to treat [out-of-state baitfish] differently....'"
477 U.S. at 151-52, 106 S.Ct. at 2454.
The Supreme Court in Maine v. Taylor cited City of Philadelphia v. New Jersey for the proposition that "[s]hielding in-state industries from out-of-state competition is almost never a legitimate local purpose, and state laws that amount to `simple economic protectionism' consequently have been subject to a `virtually per se rule of invalidity,'" while stating that, in contrast to City of Philadelphia v. New Jersey, "there is little reason in this case to believe that the legitimate justifications the State has put forward for its statute are merely a sham or a `post hoc rationalization.'" Maine v. Taylor, 477 U.S. at 148-49, 106 S.Ct. at 2453.
The Additional Fee provision in the Act advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. It has not been enacted for the purpose of economic protectionism. In enacting the Additional Fee, the Alabama legislature was not banning the collection and acceptance of hazardous waste; it was merely asking the states that are using Alabama as a dumping ground for their hazardous wastes to bear some of the costs for the increased risk they bring to the environment and the health and safety of the people of Alabama. As in Maine v. Taylor, the problem is already with us. Millions of tons of hazardous wastes have been buried at Emelle. The State of Alabama has a legitimate justification, apart from their origin, *1389 for treating the out-of-state wastes differently.
Because this waste is permanently stored in Alabama, the risk to the health and safety of the people of Alabama will continue in perpetuity. The costs to the state of regulation and monitoring of the facility will continue in perpetuity. A disproportionate share of these costs will be borne by the taxpayers of the State of Alabama for the wastes dumped by other states.
The Additional Fee serves these legitimate local purposes that cannot be adequately served by reasonable nondiscriminatory alternatives: (1) protection of the health and safety of the citizens of Alabama from toxic substances; (2) conservation of the environment and the state's natural resources; (3) provision for compensatory revenue for the costs and burdens that out-of-state waste generators impose by dumping their hazardous waste in Alabama; (4) reduction of the overall flow of wastes traveling on the state's highways, which flow creates a great risk to the health and safety of the state's citizens.
The testimony before the trial court showed that in 1985 some 341,000 tons of hazardous waste were buried in the Emelle facility. By 1989 the tonnage had grown to 788,000 tons per year. While CWM estimates that there is capacity for storage at Emelle for 100 years, the increase in tonnage has more than doubled in four years.
As the trial judge noted in his findings of fact:
"It is without dispute that the waste and substances being landfilled at the Emelle facility include substances that are inherently dangerous to human health and safety and to the environment. Such waste consists of ignitable, corrosive, toxic and reactive wastes which contain poisonous and cancer-causing chemicals and which can cause birth defects, genetic damage, blindness, crippling and death. Should a sudden or non-sudden discharge or release occur, hazardous wastes could pollute the environment, contaminate drinking water supplies, contaminate the ground water, and enter the food chain. Among these are arsenic, mercury, lead, chromium and cyanide. These wastes are generated by an entire spectrum of industry."
Unlike the situation in City of Philadelphia v. New Jersey, where there was questionable environmental concern, there is legitimate concern here in Alabama. There is no dispute that the wastes dumped at Emelle include known carcinogens and materials that are extremely hazardous and can cause birth defects, genetic damage, blindness, crippling, and death. These wastes are far more dangerous to the people of Alabama than rags infected with small-pox or yellow fever.
This Court takes judicial notice of the fact that there is a finite capacity for storage of hazardous waste at the Emelle facility and that the capacity is rapidly being reached. The record reflects that 85% to 90% of the tonnage that is permanently buried at Emelle is from out-ofstate. There is nothing in the Commerce Clause that compels the State of Alabama to yield its total capacity for hazardous waste disposal to other states. To tax Alabama-generated hazardous waste at the same rate as out-of-state waste is not an available non-discriminatory alternative, because Alabama is bearing a grossly disproportionate share of the burdens of hazardous waste disposal for the entire country. Here, the statute that creates the Additional Fee does not needlessly obstruct interstate trade, nor does it constitute economic protectionism. It is a responsible exercise by the State of Alabama of its broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources.
The Commerce Clause is designed to promote national unity and discourage economic protectionism. However, as previously stated, statutes that are facially discriminatory can survive the strict scrutiny of Commerce Clause analysis. In Northeast Bancorp, Inc. v. Board of Governors of the Federal Reserve System, 472 U.S. 159, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985), the Supreme Court examined Massachusetts and Connecticut statutes forbidding *1390 banks outside the New England region from taking over in-state banks, while allowing New England banks to do so. The Court held that this was a legitimate state purpose.
For the reasons stated above, we hold that the Additional Fee provision of Act No. 90-326 is not invalid under the Commerce Clause of the United States Constitution. The Additional Fee does not needlessly obstruct interstate trade or attempt to place Alabama in a position of economic isolation. It merely retains Alabama's broad regulatory authority to protect the health and safety of its citizens and the integrity of its natural resources. The evidence in this case amply supports the conclusion that the Additional Fee serves legitimate local purposes that could not adequately be served by available nondiscriminatory alternatives. This is not a case of arbitrary discrimination against interstate commerce; the record suggests that Alabama has legitimate reasons, apart from their origin, to treat out-of-state wastes differently. The judgment of the trial court is therefore reversed as to this issue.
The final issue before the Court is whether the trial court erred in holding that Governor Hunt had standing to raise the issue of the constitutionality of the Cap provision. CWM contends that the complaint it filed challenged the constitutionality of the Base Fee and the Additional Fee. Governor Hunt filed a counterclaim, seeking to have the trial court declare the Cap provision constitutional. CWM argues that the Governor lacked standing to raise that issue and cites Casey v. Travelers Ins. Co., 531 So.2d 846, 849 (Ala.1988), wherein this Court stated: "`Where a particular litigant is not within the group of persons affected by the statute or portion thereof which is allegedly unconstitutional, such litigant lacks standing to raise such constitutional issue.'" (Quoting Fletcher v. Tuscaloosa Federal Savings & Loan Ass'n, 294 Ala. 173, 178, 314 So.2d 51, 56 (1975).)
We find CWM's challenge to Governor Hunt's standing to be without merit. The Governor's counterclaim was filed only after CWM had sued him in a United States District Court, alleging that the Cap provision violated CWM's federally protected rights. Further, the trial court's jurisdiction over the question of the validity of the Cap provision was expressly invoked in CWM's original complaint alleging the invalidity of the entire Act. Thus, there existed a justiciable controversy that Governor Hunt, as a state official, had standing to raise in a counterclaim for a declaratory judgment. Curry v. Woodstock Slag Corp., 242 Ala. 379, 6 So.2d 479 (1942).
For the reasons stated above, the judgment of the trial court is due to be affirmed as to all issues save the Additional Fee and reversed and the cause remanded as to the issue of the Additional Fee.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, ADAMS, STEAGALL and INGRAM, JJ., concur.
HOUSTON, J., concurs in the judgment.
HOUSTON, Justice (concurring in the judgment).
Until the United States Supreme Court holds that hazardous waste (waste that the trial court found contained poisonous chemicals that can cause cancer, birth defects, genetic damage, blindness, crippling, and death) is an article of commerce protected by the Commerce Clause of the United States Constitution, I refuse to declare the additional fee provision of Act No. 90-326, which was duly enacted by the Alabama Legislature and approved by the Governor of Alabama, unconstitutional as violative of the Commerce Clause of the United States Constitution.
If the United States Supreme Court holds that waste containing poisonous chemicals that can cause cancer, birth defects, genetic damage, blindness, crippling, and death is an article of commerce protected by the Commerce Clause of the Constitution, then I am bound by that ruling under the Supremacy Clause of Article VI of the United States Constitution. Alabama lost that battle over 125 years ago; however, I do not believe that such waste *1391 is an article of commerce protected by the Commerce Clause, and I do not believe that the Alabama Supreme Court is bound by the decision of any other federal court on this issue. United States ex rel. Lawrence v. Woods, 432 F.2d 1072 (7th Cir.1970), cert. denied sub nom, Lawrence v. Woods, 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1971).
I can appreciate how Judge Phelps, a distinguished trial judge, could feel compelled to comply with a legal precedent of the 11th Circuit Court of Appeals, in the absence of an opinion on that point by this Court; however, "`there is a parallelism but not paramountcy'" between the 11th Circuit Court of Appeals and this Court, "`for both ... courts are governed by the same reviewing authority of the [United States] Supreme Court.'" United States ex rel. Lawrence v. Woods, 432 F.2d at 1075, quoting the Supreme Court of New Jersey in State v. Coleman, 46 N.J. 16, 214 A.2d 393, 403 (1965), cert. denied, 383 U.S. 950, 86 S.Ct. 1210, 16 L.Ed.2d 212 (1966).
NOTES
[1] (1) The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.; (2) the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 et seq.; (3) the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.
[2] "The Court deems irrelevant any evidence attributing to any state officials any motive of discriminating against interstate commerce. It is well-established that `[i]nquiries into [lawmakers'] motives or purposes are a hazardous matter.... What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, ..." United States v. O'Brien, 391 U.S. 367, 383-84, 88 S.Ct. 1673, 1682-83, 20 L.Ed.2d 672, 684 (1968), cited in, CECOS International, Inc. v. Jorling, 895 F.2d 66, 73 (2d Cir.1990)."
[3] "Similarly, in the forms which the EPA submits in connection with its waste reduction program, the agency asks states to list measures they are taking to reduce the generation of waste; the EPA lists fees as one example of such measure."
[4] "CWM's claim that the legislature was motivated by improper motivations is also irrelevant for equal protection purposes. `[N]o case in this Court has held that a legislative act may violate equal protection solely because of the motivations of those who voted for it.' Palmer v. Thompson, 403 U.S. 217, 224, 91 S.Ct. 1940, 1944, 29 L.Ed.2d 438 (1971), cited in CECOS International v. Jorling, supra, 895 F.2d at 73."
[5] (1) The Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq.; (2) the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2601 et seq.; (3) the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq.
[6] "The Court notes that the Cap provision contains the following language: `Provided, however, that the Governor or the Governor's designee may allow disposal of hazardous wastes or hazardous substances in excess of the tonnage disposed of during the benchmark period if such action is determined by the Governor or the Governor's designee to be necessary to protect human health or the environment in the state, or to allow the state to comply with its obligations to assure disposal capacity pursuant to applicable state or federal law as determined by the Governor or his designee.' Act 90-326, § 9."